OPINION OF THE COURT
Fuchsberg, J.
Substantively, we hold that, since the termination of parental rights must be predicated on one or more of the grounds specifically enumerated in section 384-b of the Social Services Law, none of which include “unfitness” as such, it could not be based on a finding of the latter alone. Procedurally, we further hold that a habeas corpus proceeding to obtain custody of a child is not an appropriate substitute for a proceeding under section 384-b.
The litigation to which these rulings pertain arises from the birth of a male child out of wedlock on March 14,1974. From the beginning, the mother, then but 14 years of age, was intent on putting the child up for adoption. Persisting in this course over the objection of Ricky Ralph M., the child’s father, himself then only 16, by April 11, 1974 she already had surrendered the child to the Onondaga County Department of Social Services and this agency, in turn, had placed the child with foster parents in contemplation of adoption. Less than a month later, on May 6, 1974, the father, who always acknowledged his parenthood, commenced a habeas corpus proceeding against the agency with the objective of procuring the transfer of custody of the child to himself.[1] The mother of the child never opposed his application. Nevertheless, without any alteration in the nature of the proceeding, some eight years later we now confront an order of the Appellate Division affirming, *80 without opinion, an order of the Family Court which permanently terminated the father’s parental rights.[2]
Before tracing the tortuous and attenuated course by which this result was reached, a sense of order calls upon us to identify some distinctive characteristics of the two legal concepts, custody and parental rights, which here seem to have been so unceremoniously run together.
Custody is dominated by concern for the best interest of the child (see Friederwitzer v Friederwitzer, 55 NY2d 89, 95; Matter of Nehra v Uhlar, 43 NY2d 242, 248; Domestic Relations Law, §§ 70, 240; 2 Foster-Freed, Law and the Family, § 29:5). Case law tells us that, where a battle for custody is waged between parent and a third party, as here between father and agency, the parent may not be denied custody absent a threshold showing of “surrender, abandonment, persisting neglect, unfitness or other like extraordinary circumstances” (Matter of Bennett v Jeffreys, 40 NY2d 543, 544). Obeisance to the parental relation is so strong that, even when “extraordinary circumstances” do exist, this alone does not justify depriving the parent of custody. It does no more than trigger the “best interests of the child test.” (Id., at p 548.) Even so, the underlying parental rights subsist.
In contrast, the far more embracing matter of a judicial termination of parental rights is, as is legal adoption, a creature of statute (Matter of Malpica-Orsini, 36 NY2d 568, 570). When it is sanctioned, it “is both total and irrevocable. Unlike other custody proceedings, it leaves the parent with no right to visit or communicate with the child, to participate in, or even to know about, any important decision affecting the child’s religious, educational, emotional, or physical development” (Lassiter v Department of Social Servs., 452 US 18, 39 [Blackmun, J., dissenting]; see Domestic Relations Law, § 117). For all practical purposes, the parent no longer exists. In producing this result, it cuts across a norm of nature as instinctive and as fulfilling as only procreation and the ensuing bond between parent and offspring can be (Developments — The Family, 93 Harv L Rev 1156, 1351). As the majority put it *81 in Lassiter, “[a] parent’s interest in the accuracy and justice of the decision to terminate his or her parental status is, therefore, a commanding one” (452 US, at p 27) and may not be accomplished without stern adherence to the dictates of due process (see Santosky v Kramer, 455 US _, 50 USLW 4333, 4335). It follows that, except by consent of the parent affected (Social Services Law, § 384), termination may be ordered only for one or more of four reasons set forth in section 384-b of the Social Services Law. These are (1) abandonment (subd 4, par [b]), (2) inability to care for the child due to mental illness or retardation (subd 4, par [c]), (3) permanent neglect (subd 4, par [d]), and (4) severe or repeated child abuse (subd 4, par [e]).[3]
So oriented, in retracing the path by which this case arrives at the present point, we first note that, from the beginning, it was not uninfluenced by the evolution of unwed fathers’ rights which has followed the United States Supreme Court’s 1972 decision in Stanley v Illinois (405 US 645), where, in striking down a statute under which the children of unwed fathers automatically became wards of the State upon the death of the mother, it declared that “all * * * parents are constitutionally entitled to a hearing on their fitness before their children are removed from their custody” (405 US, at p 658). Specifically, the father’s suit was initially dismissed by the Family Court because, though consent to a proposed adoption by an unwed mother was mandatory under our Domestic Relations Law (§111, subd 1, par [c]), neither the consent of nor notice to an unwed father was required. But relying on Stanley and on Matter of Malpica-Orsini (36 NY2d 568, app dsmd sub nom. Orsini v Blasi, 423 US 1042), where Stanley was interpreted to entitle an unwed father only to an opportunity to be heard on what was in the best interests of the child, the Appellate Division vacated the dismissal and remanded so that “certain minimal rights are extended to the natural father of an illegitimate child” (49 AD2d 1035).[4]
*82 On remand, the Family Court, satisfied that the father had standing to seek custody, but finding that the best interests of the child would better be served by proceeding with the adoption, denied his habeas petition. Again there was a reversal. This time the Appellate Division had to reckon with Caban v Mohammed (441 US 380), in which the Supreme Court, disregarding its disposition of Malpica-Orsini,[5] had then for the first time held section 111 of our Domestic Relations Law unconstitutional because the statute afforded unequal protection to unwed fathers by providing that the consent of unwed mothers, but not of unwed fathers, was essential to an adoption. In the end, the Appellate Division concluded that, absent his consent, the best interest of the child “cannot act as a substitute for a finding of abandonment”, that “[wjhere the issue is the right of a natural parent to custody of his child, it is established that a parent cannot be replaced because someone else could do a better job of raising the child” and that neither the “abandonment, fitness or persistent neglect” nor the “extraordinary circumstances” which could trigger a denial of custody under Matter of Bennett v Jeffreys (40 NY2d 543, 548, supra) had been found here. The reversing court, without any formal amendment of the nature of the proceeding, yet unaccountably intermingling the language of custody and termination, then returned the matter to the Family Court for a hearing on “the present status and intent of the parties necessary to make a proper determination upon abandonment”. (70 AD2d 367, 372.)
On this third time around, the Family Court early in 1980 heard evidence relevant to the father’s background and ability to care for his son. Neither all good nor all bad, it was established that he resided with his mother and stepfather, each of whom, favorably described by the Judge, expressed a strong desire to help manage a home for their son and grandson. Though the unwed father had gone *83 through a troublesome period in his late teens, during which he was convicted of larceny, resisting arrest and possession of stolen property and had followed a vocational pattern of short-term employments, since then he had been working steadily as a teacher’s aide in a community day care center. On this background, though the Judge found that Ricky Ralph M. had “neither surrendered, nor abandoned, nor permanently neglected his child”, he decided that the father was “not fit to raise his child” and thereupon permanently terminated his parental rights. We now reverse the order which, without comment, affirmed this determination.
The Legislature, the progenitor of law bearing on termination of parental rights, was not unaware of the importance of those rights in enacting a statute as specific as section 384-b of the Social Services Law. Its accompanying statement of legislative findings and intent includes the unsurprising observation that “it is generally desirable for the child to remain with or be returned to the natural parent because the child’s need for a normal family life will usually best be met in the natural home, and that parents are entitled to bring up their own children unless the best interests of the child would be thereby endangered” (§ 384-b, subd 1, par [a], cl [ii]). In this connection, recognizing that parents, like children, and like human beings generally, come in all ranges of perfection and imperfection, we have made it clear that, under our legal system, the State does not seek to “find ‘better’ parents for a child even though the natural parents may be willing and able to provide proper care” (Matter of Sanjivini K., 47 NY2d 374, 382). The security of the family institution and constitutional principle require no less (see Stanley v Illinois, 405 US 645, 651, supra).
By no means does the statute encourage a court, as it did here, to back into a parental termination decision. Rather, such a proceeding may be originated only by an authorized agency or foster parent (subd 3, par [b]) who serves a petition on notice to the parent and “such other persons as the [appropriate judicial officer] may in his discretion prescribe” (subd 3, par [e]). Here, no proceeding was ever brought by the agency, much less by a foster *84 parent. The courts never had anything more before them than the father’s custody proceeding.
Consequently, the proper course for the Appellate Division to have followed, once Caban’s requirement for parental consent had been brought to its attention, was to deal with custody, the only issue raised in the petition before it.[6] This issue not only was governed, as indicated, by procedures different from those mandated by section 384-b, but its ultimate adjudicatory goal was a determination of the best interests of the child rather than whether any of the grounds listed in subdivision 4 of section 384-b were present.
Indeed, the procedural jumble that in fact ensued may very well explain how the Family Court came to reach its determination to sever the father’s rights solely on a generalized finding of “unfitness”, a term used to describe one of the “extraordinary circumstances” which may correctly concern a court passing on custody (Matter of Bennett v Jeffreys, 40 NY2d 543, supra). It simply is not one of the findings which will support an order of termination under subdivision 4 of section 384-b (see, also, subd 3, par [g]).
Moreover, we observe that the section 384-b criteria — abandonment, mental illness or mental retardation, permanent neglect and repeated child abuse — when associated with a parent’s treatment of his or her child, each connote aspects of “unfitness”. Accordingly, the use of this common word in a general or descriptive rather than in a word-of-art sense in this connection is hardly remarkable (see, e.g., Santosky v Kramer, 455 US_, 50 USLW 4333, 4337, supra; Smith v Organization of Foster Families, 431 US 816, 862 [Stewart, J., dissenting]; Matter of Leon RR, *85 48 NY2d 117, 124; Matter of Sanjivini K., 47 NY2d 374, 382, supra).
All this said, we are not unaware of the fact that it often may be difficult to confine real life situations involving such emotional issues as child custody and adoption to the cold wording of statutes. Some degree of flexibility must be allowed. But wholesale disregard of the statutory scheme compels remittal to the Family Court for consideration of the question properly before it, custody of appellant’s child. Upon remittal, if the agency seeks termination of appellant’s rights, it should do so formally by commencing a proceeding pursuant to section 384-b. In this way, the agency’s petition will give the father notice of the ground or grounds on which it intends to rely. Finally, should the agency commence a termination proceeding, it, of course, will be governed by the United States Supreme Court’s recent holding that “[b]efore a State may sever completely and irrevocably the rights of parents in their natural child, due process requires that the State support its allegations by at least clear and convincing evidence” (Santosky v Kramer, 455 US _, 50 USLW 4333, supra).[7]
For all these reasons, the order of the Appellate Division should be reversed and the matter remitted to Family Court, Onondaga County, for further proceedings in accordance with this opinion.
Chief Judge Cooke and Judges Jasen, Gabrielli, Jones, Wachtler and Meyer concur.
Order reversed, with costs, and matter remitted to the Family Court, Onondaga County, for further proceedings in accordance with the opinion herein.

. Simultaneously, to strengthen his custody claim, the father commenced a filiation proceeding to establish his paternity, which, after overcoming procedural hurdles not here relevant, he succeeded in accomplishing.

. A temporary injunction obtained by the father has continued to maintain the rights of the parties in status quo.

. A fifth reason, purely declaratory of course, is that both parents are dead (subd 4, par [a]).

. Subsequent to the Appellate Division’s reversal, the Legislature incorporated the *82 substance of the Malpica-Orsini holding in a new statute, section 111-a of the Domestic Relations Law (L 1976, ch 665, § 3). At the same time, the Legislature enacted section 384-c of the Social Services Law which provided for similar notice of a proceeding to terminate parental rights or for surrender of a child to an agency for the purpose of freeing the child for adoption (L 1976, ch 665, § 1). This notice, too, was to be for the sole purpose of presenting evidence relevant to the best interests of the child.

. The court had dismissed the appeal for want of a substantial Federal question (sub nom. Orsini v Blasi, 423 US 1042).

. Section 111 of the Domestic Relations Law has been recast to fill the statutory void left by the holding in Caban (L 1980, ch 575, § 1). The statute now requires consent of the father of a child born out of wedlock if the father has maintained substantial and continuous or repeated contact with the child as evidenced by certain factors (subd 1, pars [d], [e]). On the present appeal, the agency does not contend that appellant’s consent would not be required under the amended statute and we would not hold otherwise. It is conceded that the agency prevented the appellant from maintaining contact with his child since its surrender by the mother (cf. Matter of Sanjivini K., 47 NY2d 374, 381, supra; Matter of Bennett v Jeffreys, 40 NY2d 543, 548, supra).

. Santosky mandates that section 384-b (subd 3, par [g]) of the Social Services Law be read to require that all of the statutory grounds be proved by clear and convincing evidence.