In the Matter of SARAH K. TIMMY S. et al., Appellants-Respondents; WARREN K. et al., Respondents-Appellants, and ROBERT ABRAMS, as Attorney-General of the State of New York, Intervenor-Respondent.

Second Department, August 19, 1985

#### APPEARANCES OF COUNSEL

*Frederick J. Magovern* (*Peter B. Skelos* and *Diane C. Pfirrman* on the brief), for appellants-respondents.

*Sherman Thompson & Halpin* (*John E. Halpin, Katherine G. Thompson* and *Elizabeth M. Barnett* of counsel), for respondents-appellants.

*Robert Abrams, Attorney-General* (*Maryellen Weinberg, Robert J. Schack* and *Florence E. Abrams* of counsel), intervenor-respondent *pro se.*

#### OPINION OF THE COURT

MANGANO, J. P.

The primary question to be resolved on the instant appeals is whether the extrajudicial consent to an adoption, made by the

natural parents of the child, was a valid and effective one. The question must be answered in the negative. In my view, Domestic Relations Law § 115-b, pursuant to which the form upon which the natural parents gave their extrajudicial consent was promulgated, is unconstitutional on its face, insofar as it fails to require that such an extrajudicial consent form to an adoption advise the natural parents that even if they timely revoke their extrajudicial consent to the adoption, as allowed by statute, the child will not necessarily be returned to them, but may be subject under certain circumstances, to a judicial determination of custody based on a "best interests" test. Since the extrajudicial consent form executed by the natural parents in the case at bar did not so advise them, their consent given on that form cannot stand and must be declared null and void. Accordingly, the infant must be returned to her natural parents.

## I

At the outset we must dispose of a procedural problem. The adoptive parents have appealed, as limited by their brief, from so much of an order of the Family Court, Suffolk County, dated September 24, 1984, as deemed a notice of revocation of an extrajudicial consent to an adoption, signed by the natural parents of the infant in question, to have been timely given. The natural parents have cross-appealed, as limited by their brief, from so much of the same order as, upon considering their notice of revocation of their consent to the adoption to have been timely given, failed to direct that the child be returned to them forthwith and instead directed that a hearing be held to determine whether her best interests required that she be returned to her natural parents or that the adoption petition be approved.

The appeal and cross appeal from the order dated September 24, 1984, must be dismissed because no appeal lies as of right from a nondispositional order of the Family Court (Family Ct Act § 1112 [a]). The issues raised on that appeal and cross appeal are brought up for review and have been considered on the appeal by the natural parents from the dispositional order of the Family Court, dated November 7, 1984, which refused to give effect to the notice of revocation of consent filed by the natural parents and, in effect, granted the adoption petition (see, Family Ct Act § 1112; CPLR 5501 [a] [1]).

## II

Warren and Christine K. are the natural parents of a girl, Sarah, who was born on November 6, 1983, with the condition known as Down's Syndrome. They decided to give the child up

for adoption and her physical transfer was made on November 11, 1983. Toward the end of November 1983, the natural parents executed two separate consent forms to the adoption. The first was a judicial consent form, which pursuant to statute (Domestic Relations Law § 115-b [1] [c]), and its terms, becomes operative and "irrevocable" only when *executed or acknowledged before a judge or surrogate of the court in which the adoption proceeding is to be commenced"* (emphasis supplied). The second was an extrajudicial consent form which pursuant to statute (Domestic Relations Law § 115-b [1] [d] [i]), and its terms, *is operative immediately and becomes irrevocable "thirty days after the commencement of the adoption proceeding unless written notice of revocation thereof shall have been received * * * within said thirty days"* (emphasis supplied).

Both consent forms contained the following language which was added at the request of the natural father who is an attorney: "We came to our decision to place our baby for adoption because of her Down's Syndrome condition and our belief that the petitioners are far more capable of dealing with this condition and raising the child than we are."

On December 19, 1983, an adoption proceeding was commenced on behalf of the adoptive parents in the Family Court, Suffolk County. However, the natural parents first received notice of the adoption proceeding between January 23 and January 25, 1984, more than 30 days after its commencement, when their attorney received notice from the Suffolk County Family Court that the petition for adoption had been filed and that a hearing on the petition for adoption would be held on March 1, 1984.

Toward the end of February 1984, the natural mother made certain inquiries and did research into the subject of Down's Syndrome. Both she and her husband decided to revoke their consents to the adoption. On February 29, 1984, they forwarded a revocation of consent form which was received by the court on March 2, 1984. The court hearing, scheduled for March 1, 1984, was canceled.

### III

The natural parents argued in Family Court that Domestic Relations Law § 115-b is unconstitutional on its face in that it (1) fails to require that they be given notice as to when the 30-day revocation period begins and (2) fails to require that they be informed of all the consequences of timely revocation of an extrajudicial consent to an adoption, to wit, that if the adoptive parents oppose the timely revocation of an extrajudicial consent,

the child is not immediately returned to the natural parents but rather a "best interests" hearing is held at which the natural parents do not have any superior right to the custody of the child (Domestic Relations Law § 115-b [3] [d] [i], [ii], [v]).

In addition, the natural parents argued before the Family Court that by virtue of their simultaneous execution of both an extrajudicial and judicial consent form to the adoption they became confused and assumed that (1) the judicial consent form was the controlling form and (2) their consent to the adoption was therefore "tentative" or inoperative, until they appeared at a hearing before the appropriate Surrogate or Family Court Judge.

The Family Court rejected the natural parents' constitutional attacks on the statute on the ground that they were not aggrieved by either of the two alleged defects in the statute. In this regard, the Family Court held that (1) the natural parents had failed to comply with the 30-day provision of the statute even after they actually received notice of the adoption hearing (relying upon *Matter of Anonymous,* 55 AD2d 383) and (2) the record indicated that the natural parents would have executed the extrajudicial consent form even if they had been advised of all the consequences of a timely revocation of their consent given on that form.

With respect to the natural parents' argument that they were confused by the simultaneous execution of both an extrajudicial and a judicial consent form to the adoption, the Family Court did not accept this argument in toto. However, it did hold that the simultaneous execution of both consent forms had the effect of confusing them with respect to the time period within which their extrajudicial consent to the adoption could be revoked. Specifically, the Family Court was of the view that the natural parents could reasonably have believed that they had until March 1, 1984, the day of the hearing on the adoption, to revoke their extrajudicial consent. Accordingly, to remedy what it perceived as a denial of due process to the natural parents, the Family Court treated their revocation of their extrajudicial consent as timely and afforded the natural parents a "best interests" hearing as mandated by the statute (Domestic Relations Law § 115-b [3] [d] [ii]).

At the conclusion of the hearing, the Family Court held that the "best interests" of the child would be served if she were adopted by the proposed adoptive parents.

## IV

In reaching its conclusion, the Family Court implicitly recognized the distinction between an extrajudicial and a judicial consent to an adoption when it held that the confusion of the natural parents was limited *solely* to the question of the time that they had to revoke the *extrajudicial consent form.* Indeed, I have no quarrel with the holding of the Family Court on this particular aspect of the case.

Nevertheless, I am of the view that the Family Court erred in rejecting, on the basis of standing, the natural parents' constitutional attack on the statute's failure to require that the extrajudicial consent form advise them of all the consequences of a timely revocation of their consent given on that form. In rejecting this attack on the statute, the Family Court relied on the decision of this court in *Matter of Daniel C.* (99 AD2d 35, *affd* 63 NY2d 927). In *Matter of Daniel C.,* the natural mother argued that (1) "as a matter of judicial construction section 115-b must be found to require the consent form to inform the signer concerning the actual legal consequences of a notice of revocation" and (2) if the statute was not so construed, it was unconstitutional and deprived the natural parents of due process by sanctioning the use of the "deceptive form" (*Matter of Daniel C.,* 99 AD2d 35, 39, *supra*).

The majority of this court in *Matter of Daniel C.* (*supra*), held that the statute was clear in its intent that the consequences of a timely revocation of an extrajudicial consent form to an adoption, need not be included in that form. With respect to the constitutional argument raised by the natural mother, the majority of this court and the Court of Appeals held that the natural mother was not aggrieved by this alleged defect in Domestic Relations Law § 115-b, in view of her lawyer's explicit concession, on the record, that she had not been misled by the consent form. No such concession exists on this record, and it is unclear, from the decision of the Family Court, what other facts led it to the conclusion that the natural parents would have signed the extrajudicial consent form, even if they had understood the full consequences of a timely revocation of the consent given on that form. Presumably, it was the language inserted by the natural parents in the consent forms that influenced the Family Court to hold as it did on the issue of standing.

In my view, the inserted language simply indicates that the natural parents initially had no doubts about their decision to place their child up for adoption. However, the inserted language does not in any way constitute a concession by the natural

parents that they would have signed the extrajudicial consent form to the adoption even if they had known of all the consequences that would occur if they decided to timely revoke their consent, which they had a right to do pursuant to the statute. Without a concession similar to the one in *Matter of Daniel C.* (*supra*), the attack of the natural parents on the statute must be considered on the merits, and on the merits, the statute does not pass constitutional scrutiny. In this regard, the dissent of Justice Gibbons in *Matter of Daniel C.* (99 AD2d 35, 66-69, *supra*), is particularly relevant:[1]

"A due process analysis proceeds through a two-part inquiry: whether there has been a deprivation of a protected liberty or property interest, and if so, what process is due (see *Logan v Zimmerman Brush Co.,* 455 US 422, 428). There can be no doubt that parental rights are a constitutionally protected interest since the Supreme Court has consistently recognized that freedom of choice in matters of family life is a fundamental liberty interest (see *Santosky v Kramer,* 455 US 745, 753, and cases cited therein). Our State courts have also recognized that the interest of the natural parent in remaining the legal parent of his or her child is of constitutional magnitude (see *Matter of Leon RR.,* 48 NY2d 117). Thus, it has been held that 'a court may not terminate all parental rights by offering a child for adoption where there has been no parental consent, abandonment, neglect or proven unfitness, even though some might find adoption to be in the child's best interests (*Matter of Corey L v Martin L,* 45 NY2d 383)' (*Matter of Sanjivini K.,* 47 NY2d 374, 382; see, also, *Matter of Ricky Ralph M.,* 56 NY2d 77). A natural parent's 'desire for and right to "the companionship, care, custody, and management of his or her children"' is an interest far more precious than any property right (*Lassiter v Department of Social Servs.,* 452 US 18, 27, quoting from *Stanley v Illinois,* 405 US 645, 651). It follows that when the State establishes a mechanism to terminate familial bonds, it must provide the parents with fundamentally fair procedures (*Santosky v Kramer,* 455 US 745, *supra*).

---

1. In *Matter of Daniel C.* (99 AD2d 35, *affd* 63 NY2d 927), Justice Gibbons was of the view that in order to withstand a constitutional attack, Domestic Relations Law § 115-b had to be construed to read that the natural parents be informed, in the body of an extrajudicial consent form, that a timely revocation thereof would not necessarily result in the immediate return of the child to them. Accordingly, his dissent was addressed to the failure of the extrajudicial consent form to conform to the statute. However, his language is equally applicable to the statute, which the majority of the court ruled, in *Matter of Daniel C.,* could not be so construed.

"Due process requires, at a minimum, 'that deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case' (*Mullane v Central Hanover Trust Co.,* 339 US 306, 313). However, the due process rights to notice and a hearing prior to a civil judgment are subject to waiver (*Fuentes v Shevin,* 407 US 67, 94-95; *Overmeyer Co. v Frick Co.,* 405 US 174, 185). Where there is a waiver of adjudication, the functional equivalent of notice is the presentation of information to the waiving party (Rubin, Toward a General Theory of Waiver, 28 UCLA L Rev 478, 539; Note, Fairness, Flexibility, and the Waiver of Remedial Rights by Contract, 87 Yale L J 1057, 1074-1077). In the extrajudicial adoption context, the consent form, which operates as a waiver of parental rights, undertakes the notice function since it is the only statutorily guaranteed source of information for the natural parent. Generally, notice given prior to a hearing must clarify the basis for the government's proposed action in order to give the party a chance to defend himself (see *Wolff v McDonnell,* 418 US 539; *Goldberg v Kelly,* 397 US 254). But, in a waiver setting, where there is no opportunity for a hearing or defense on the merits, the purported waiver document must inform the party of the legal consequences of the waiver so that an intelligent decision can be reached (see *Fuentes v Shevin,* 407 US 67, 95, *supra; Stone v Maher,* 527 F Supp 10, 17; *County of Ventura v Castro,* 93 Cal App 3d 462, cert den 444 US 1098). If a consensual adoption proceeding is to afford a natural parent due process of law, the consent must be sufficient in form to warrant the relinquishment of parental rights (see *Matter of Andersen,* 99 Idaho 805).

" 'A waiver is "the intentional relinquishment of a known right with both knowledge of its existence and an intention to relinquish it" ' (*Werking v Amity Estates,* 2 NY2d 43, 52, quoting from Whitney, Contracts [4th ed], p 273). Where personal liberty is involved, as in the criminal context, it is generally held that a waiver of due process rights must be voluntarily, knowingly, and intelligently made (see, e.g., *Brady v United States,* 397 US 742, 748; *Miranda v Arizona,* 384 US 436, 444; see, also, *Johnson v Zerbst,* 304 US 458, 464). The standard for relinquishment of parental rights, also a fundamental liberty interest, has been held to be governed by the same standard (see *Matter of T.W.C.,* 38 NY2d 128; *Matter of Infant S. [Tretin],* 48 AD2d 425, 426). Since the consent to adoption constitutes the relinquishment of parental rights, it must be executed with full awareness of the legal consequences (*Matter of Andersen,* 99 Idaho 805, 815, *supra*) * * *

"Given the above circumstances, I conclude that the extrajudicial consent form used in this case is deceptive since it conveys to the lay person the impression that it can be wholly extinguished within 30 days of the initiation of the adoption proceeding and that no untoward consequences will flow from it if revocation is timely. The impression thus conveyed is a strong and unfair inducement to the procurement of consents to adoption. The form actually undermines the knowing and voluntary nature of the consent (see *Matter of Andersen,* 99 Idaho 805, *supra*). Of particular significance is the fact that, as already noted, constitutional principles and our basic societal mores generally allow a natural parent to remain the legal parent even if he/she is not the best parent possible, or even available, and that he or she will continue to fill this role even if it might be said that the child's best interests would otherwise be served (see *Matter of Ricky Ralph M.,* 56 NY2d 77, *supra*)".

Since Domestic Relations Law § 115-b is unconstitutional on its face in failing to require that an extrajudicial consent form to an adoption advise the natural parents of all the consequences of a timely revocation of their consent if given on that form, the extrajudicial consent herein, which was executed pursuant to the statute, was invalid, and the infant child must be returned to her natural parents.[2]

V

We have reviewed the remaining points raised by the natural parents in support of their argument that the child must be returned to them, including (1) duress, (2) lack of counsel and (3) alleged violations of Social Services Law §§ 371 and 374, and find them to be without merit (*Matter of Podmore v Our Lady of Victory Infant Home,* 82 AD2d 48, 51; *Matter of E.W.C.,* 89 Misc 2d 64, 72; Domestic Relations Law § 115-b [4]).

In view of our determination, we need not reach the merits of the natural parents' argument that the clear and convincing evidence standard should have been utilized at the "best inter-

---

**2.** The natural parents' attack on the statute's failure to provide that they be given notice of when the 30-day revocation period commences, also has merit (*see, Matter of Anonymous,* 55 AD2d 383, 385, 390 [Suozzi, J., dissenting]). Indeed, the Family Court's rejection of this argument based on the natural parents' failure to revoke their consent within 30 days after receiving notice of the adoption hearing is inconsistent with (1) its specific finding that they were confused as to time period within which they could revoke and (2) its holding that their revocation would be treated as timely. However, a "best interests" hearing is the proper remedy for this particular constitutional defect (*see, Matter of Anonymous, supra*) and a "best interests" hearing was in fact granted in this case.

ests" hearing, rather than the preponderance of the evidence standard.

## VI

Accordingly, the appeal and cross appeal from the nondispositional order dated September 24, 1984, should be dismissed, without costs or disbursements. The dispositional order dated November 7, 1984, should be reversed, without costs or disbursements, the nondispositional order of the same court dated September 24, 1984, should be vacated, the judicial and nonjudicial consents to adoption signed by the natural parents should be declared void *ab initio,* the petition for adoption should be denied, and the matter should be remitted to the Family Court, Suffolk County, for the transfer of custody of the infant from the adoptive to the natural parents as expeditiously as possible.

O'CONNOR, J. (concurring). The threshold question here presented — indeed the overriding issue — is whether the natural parents, if otherwise fit, have either abandoned, surrendered, or forfeited their parental rights.

Part of that inquiry is quickly resolved because, in its discussion of the character and fitness of both the natural and the proposed adoptive parents, nisi prius found: "Christine K., Warren K., Lisa S. and Timmy S. are fine people, each possessing the positive character traits that a Court looks for in custody disputes and too often fails to find."

So much for the fitness issue.

But what of the forfeiture or surrender of their parental rights. Did the natural parents knowingly and intelligently surrender those rights?

The proposed adoptive parents maintain that the natural parents, having signed the extrajudicial consent form and having then failed to timely file a revocation pursuant to Domestic Relations Law § 115-b, may not now revoke their consent and the adoption is in order.

The natural parents reply with a multifaceted constitutional attack on the extrajudicial consent form which they signed in November 1983, the statute upon which that form is based (Domestic Relations Law § 115-b), and the manner in which the form was executed.

In addressing these issues and in the course of an extended hearing, Family Court concluded that: "Under the circumstances, and considering the evidence presented, the K.s' claim that they thought their consent to be tentative, or preliminary, is entirely plausible. They believed that they were able to

revoke their consent at any time prior to their appearance before the Court. That belief was induced by the forms and procedures used by the adoption bureau of the Family Court of Suffolk County plus the other circumstances in the case."

It then concluded: "That Mrs. K. fully believed that to be so is evidenced by the fact that she forced herself to visit a school for Down's Syndrome children, and otherwise learn about the disability, immediately prior to the scheduled Court appearance. That visit, and the information obtained are what crystalized the K.s' decision to revoke their consent. They thought, although their decision was made at the eleventh hour, that it was timely. The application of Section 115-b so as to make their revocation effort untimely deprives the K.s of due process of law."

As we analyze the circumstances existing at the time the consent forms were signed, let us first find out how this all came about. Where did the forms originate? Who prepared and drafted them? Were the natural parents represented by counsel? Did counsel or *anyone* explain the full significance of the forms? Who filed the forms? Who drew the adoption petition? Who filed it? Did anyone notify the natural parents of the date of the filing? Very interesting questions. Let's look at the answers.

Directly after Sarah's birth, the obstetrician walked into the recovery room and flatly announced to Warren and Christine K., "I have bad news for you, I am almost certain that the baby is a Mongoloid". Devastating news indeed and enough to tumble the K.s into a state of shock and trauma. They began discussing whether or not they could take care of their unfortunate baby and in this state of mental upheaval, they concluded that they could not. A social worker at the hospital referred them to a woman named Janet Marchese, a person whom the Family Court described as "a full time humanitarian", who had been successfully involved in the placing of some 600 to 700 Down's Syndrome children. Mrs. Marchese recommended David Verplank, a lawyer with whom she worked, and suggested that Mr. K. pay Verplank's fee because the adoptive parents would, in all probability, incur significant medical bills following the adoption. Mr. K. agreed.

Five days after Sarah's birth, on November 11, 1983, Mr. K. went to the hospital and handed Sarah to a nurse who had accompanied Mr. Verplank for the purpose of the transfer. With Mr. K. at the time was one of his law partners, who was there, not in his capacity as an attorney, but as a close friend. Indeed, the court found that "[n]either Warren K., nor either of his two

partners had any experience or prior knowledge concerning adoptions". It is hardly necessary to note that at this point in time, there was complete harmony between the parties and that that condition continued until the K.s, after deciding that they were making a mistake, attempted to regain custody of Sarah. On November 11, Verplank gave to Mr. K.'s law partner an envelope containing papers which he (Verplank) had prepared for Warren and Christine K. to sign. The partner handed the envelope to Mr. K. and when the latter opened it the following weekend, he found the following:

(1) a judicial consent form which becomes irrevocable when "executed or acknowledged before a judge" (Domestic Relations Law § 115-b [1] [c]). At the bottom of that form was a place for a Family Court Judge to acknowledge the signature of the natural parents. The meaning and significance of this form is clear and creates problems for no one;

(2) an extrajudicial consent form which read in pertinent part as follows: "I understand that *in the event Consent is not executed before a Judge of the Family Court,* the County of Suffolk, then and in that event *this Consent shall become irrevocable thirty days after the commencement of the adoption proceeding* unless written notice of revocation thereof shall be received by this Court within said thirty days" (emphasis supplied).

This is the source and the cause of all the heartbreak and confusion that followed and attention is directed to the words "in the event Consent". In the extrajudicial consent form in the case of *Matter of Daniel C.* (99 AD2d 35, 49, *affd* 63 NY2d 927), that particular phrase read: "in the event that *this* consent" (emphasis supplied). Moreover, relevant words of the statute upon which the extrajudicial consents in both *Daniel C.* and the case at bar are predicated read "the consent", etc. The fatal absence in the instant case of the modifying word "this" or "the" is not only significant and material but clearly creates the inference, especially if both consent forms are read together as, in fact, they were, that, as Family Court found, "if the natural parents anticipated appearing before a judge to give their consent, the thirty day period in the extrajudicial consent form would not expire prior to the Court date. As shall be detailed subsequently, Mr. K. read the forms together and, knowing that he and his wife had to appear before a judge to give their consent for Sarah's adoption, reasonably concluded that he could revoke their extrajudicial consent at any time prior to that Court appearance";

(3) a bill of $750 plus disbursements; and

(4) a "Natural Parents" affidavit. At the bottom of this form is a place for a Family Court Judge to take the oaths of the natural parents.

Mr. K. presented the forms to his wife for her signature explaining that the adoption would not be "final" until they "appear[ed] before the Court".

On November 28, 1983, the executed forms were returned to Mr. Verplank.

Let us here briefly review the role played by Mr. Verplank. He was recommended to the Ks., in all good faith, by Mrs. Marchese. His fee, $750, was his standard fee for handling complete adoptions and was paid by the Ks. The forms of consent to be signed by the Ks. were drafted and drawn by Verplank. From the time Verplank delivered the consent forms to Mr. K's. law partner until they were returned to him, Verplank gave no advice nor did he explain the legal significance attached to the signing of either or both forms. This was indeed a friendly but, as it turned out, a confusing arrangement. Mr. K. thought Verplank represented him or that he represented both sides. Verplank maintained that he represented only the proposed adoptive parents, Mr. and Mrs. S., yet he accepted a full fee from the natural parents, Mr. and Mrs. K. Did he owe any duty to those who paid his fee?

In any event, now clearly acting on behalf of the proposed adoptive parents, on December 19, 1983, Verplank filed a petition signed by them for the adoption of little Sarah. Verplank never told the Ks. that the adoption papers had been filed.

As has oft been stated, due process of law embraces fundamental rights and immutable principles of justice; the use of the term is merely another way of saying that every person's right to life, liberty and property is to be accorded the fundamental principles of justice (*see, Bailey v Alabama,* 219 US 219; *Ives v South Buffalo Ry. Co.,* 201 NY 271). From the days of Magna Carta, the concept of due process has mandated that, at the very least, a person not be deprived of a legitimate property or personal right without adequate notice of the possibility of such deprivation (*see, Papachristou v City of Jacksonville,* 405 US 156; *United States v Wood, Wire & Metal Lathers Intl. Union,* 471 F2d 408, *cert denied* 412 US 939). I fear that that is exactly what is happening here. Unlike *Matter of Daniel C.* (99 AD2d 35, *supra*), where the natural mother admitted she was not misled by the consent form, at bar, as Family Court found, the natural parents from the very beginning were in fact deceived by the forms used and the procedures followed, and this deception

deprived them of their own child without notice. To hang such a result like an albatross around the necks of these beleaguered parents would, in my opinion, be unconscionable. Accordingly, I would restore little Sarah to her natural parents.

It is a proper conclusion that the natural parents were lulled into a false sense of security that they had until the court date to finalize their consent and that because of the lack of any notice provided by the forms, they were denied due process of law. It is firmly established that a waiver of constitutional rights must be voluntarily, knowingly and intelligently made, and this should be no less true for relinquishment of parental rights than for any other liberty right (*see, Johnson v Zerbst,* 304 US 458; *Matter of Male Infant L.,* 61 NY2d 420, 427; *Matter of Daniel C.,* 99 AD2d 35, 67 [Gibbons, J., dissenting], *affd* 63 NY2d 927, *supra; Matter of Infant S.,* 48 AD2d 425, 426). Hence, in the absence of a true understanding of the terms of the adoption and its consequences, the consent of the natural parents was not free, voluntary and final (*see, Matter of Unnamed Baby Boy,* 110 AD2d 1019). By granting the natural parents a "best interests" hearing, the Family Court treated them not as parents who had never given a final consent, but as if they had fully understood the terms of the adoption, fully consented and then elected to exercise their 30-day revocation right. The only appropriate remedy was *to* declare the natural parents' tentative "consent" a nullity *ab initio* and to return them to the status quo ante. To do anything less is to subject them to an on-going deprivation of due process of law (*see, Matter of Unnamed Baby Boy, supra*).

The Court of Appeals has noted that " '[a] change of mind is to be accorded great sympathy, and, in a proper case, encouragement and favorable action' * * * especially * * * where the natural parent has sought return within a very short time" (*Matter of Male Infant L.,* 61 NY2d 420, 429, *supra*). Here, where the natural parents did not even finally and unconditionally consent to the adoption, not just sympathy, but due process requires that their decision not to go through with the adoption be given full effect and that the child be returned forthwith to their arms.

The facts at bar highlight the inherent defects in the statute (Domestic Relations Law § 115-b) in its failure to afford the natural parents notice as to when the adoption proceeding had been commenced. This is the event that sets in motion the time clock of the 30-day period within which a revocation of consent may be filed. In that respect the statute is badly flawed and may indeed, as concluded by Justices Mangano and Lawrence, render the section unconstitutional as written (*cf. Matter of Anonymous,* 55 AD2d 383; *Matter of Daniel C.,* 99 AD2d 35, *supra*).

Similarly troubling, as pointed out by Justice Mangano in his plurality opinion, is the failure of the statute to require that the extrajudicial consent form apprise the natural parents that the timely revocation of their consent entitles them only to a best interests hearing and not to the return of their child (*see also, Matter of Daniel C.*, 99 AD2d 35, 47-82 [dissenting opn of Gibbons, J.], and 63 NY2d 927, 929-940 [dissenting opn of Jasen, J.], *supra*). However, in light of our factual finding that the natural parents never gave their final and unequivocal consent to the adoption of their child Sarah, we do not reach the bigger issue. We do, however, urgently recommend the subject matter to the attention of the Legislature.

WEINSTEIN, J. (concurring in part and dissenting in part). I note at the outset that I agree wholeheartedly with the view of my learned colleague, Justice Mangano, with respect to the fact that the natural parents clearly and unequivocally consented to the adoption of Sarah. Upon review of the record, it cannot be gainsaid that such consent was given and that the natural parents consistently reaffirmed their decision in the weeks immediately following Sarah's birth. Nor can it reasonably be maintained that such consent was vitiated by the confusion emanating from the particular forms used. Although confusion played a significant role with regard to the natural parents' perception of the time within which to revoke the extrajudicial consent form, it had no bearing on the validity of their consent in the first place.

Without reaching the issue of the constitutionality of Domestic Relations Law § 115-b, inasmuch as I deem it improper to do so on these facts, I conclude that the real focal point of this case is whether the best interests of the child would be served by her adoption by Mr. and Mrs. S. I find, as did the Family Court, that the adoption of Sarah by Mr. and Mrs. S. is in the child's best interests. The damage which could potentially ensue by removing Sarah from all that is familiar to her, in essence, from the only family and home which she has ever known, constitutes a sufficient consideration, in my view, to justify this very difficult decision. To reach this fundamental issue, however, an evaluation of the procedural posture in which this case has reached our court is first necessary.

The natural parents in this case executed two separate forms by which they consented to the private placement adoption of the infant Sarah. The judicial consent form was to become irrevocable upon its execution before a Judge of the Family Court or a Surrogate (Domestic Relations Law § 115-b [1] [c]).

The record reveals that said consent form was not executed in this manner. The second form, the extrajudicial consent form, by its express terms was to "become irrevocable thirty days after the commencement of the adoption proceeding unless written notice of revocation thereof shall be received by this Court within said thirty days". Each form was signed by both of the natural parents and bore the following notation: "We came to our decision to place our baby for adoption because of her Down's Syndrome condition and our belief that the petitioners are far more capable of dealing with this condition and raising the child than we are".

On November 11, 1983, just five days after Sarah's birth, her natural father surrendered her at the hospital to the agents of the adoptive parents. Sarah has resided continuously with the adoptive parents since that date. The adoption proceeding was commenced by the filing of a petition for adoption in the Suffolk County Family Court on or about December 19, 1983. On January 23, 1984, the Adoption Bureau of the Suffolk County Family Court sent a notice to the natural father's law partner that the matter had been scheduled for a preliminary hearing on March 1, 1984, at which he was directed to be present along with his clients, the natural parents. That notice was received by the attorney on or before January 25, 1984.

It was not until February 29, 1984 that the natural parents executed a revocation of consent to the adoption and demanded the immediate return of Sarah. Their change of heart was precipitated by a visit, some two days prior to the scheduled court hearing, to a special school in Bellmore for children afflicted with Down's Syndrome. On the basis of their personal observations and research with regard to Down's Syndrome, the natural parents felt that they had sufficiently overcome their fears and misconceptions to enable them to accept their daughter.

Upon receipt of the adoption consent revocation, the Family Court conducted a lengthy, bifurcated hearing. The first branch of the hearing addressed the validity of the Ks.' initial consent to the adoption and the effect of their subsequent revocation.

The evidence adduced at the revocation hearing established the fact that almost immediately after learning that their baby was afflicted with Down's Syndrome, the natural parents agreed that they could not keep her. Their considerations included the possibility of a break-up of their marriage, interference with the psychological development of their normal son, and a dramatic disruption of their life-style. For example, Mrs. K. would be

unable to resume her career and they would be precluded from taking vacations and going to restaurants. Neither of the natural parents saw Sarah from the day of Mrs. K.'s discharge from the hospital on the day after giving birth, until the time Mr. K. surrendered the infant for adoption. The natural mother expressed a desire that the adoption be resolved expeditiously inasmuch as she just "wanted to forget about the whole thing" and get on with her life.

Janet Marchese, who facilitated the adoption by acting as intermediary between the natural and adoptive parents, had requested an opportunity to consult with both parents in order to assure herself of their familiarity with the handicap and of the numerous options available to them. The natural father replied that his wife was not up to talking but that he "had done some homework" and that the couple had already made their decision. He was adamant that they not know the names of any prospective adoptive parents, that there be no contact and that the adoption proceed immediately.

The hospital social worker with whom the natural parents had conferred suggested that they speak with someone from the Down's Syndrome School in Bellmore or with a family which already had a Down's Syndrome infant. The Ks. were, however, very determined to proceed with the adoption.

The Family Court (Hurley, J.) found that although the natural parents' decision to place Sarah for adoption was made in a state of acute emotional turmoil and despair, that decision was reaffirmed consistently in the weeks which followed the child's birth. The decision was a calculated and firm one and, in the words of the Family Court, "[t]heir initial decision to place Sarah was ratified by implication on each day that passed after the consent was executed, without objection until months after the fact".

Despite the fact that the natural parents themselves testified and submitted the testimony of various experts to the effect that the shock and trauma they suffered as a result of the birth of a Down's Syndrome infant prevented them from making a rational decision to place the child for adoption, it has been held that mental or emotional distress or depression is generally insufficient to overturn a consent to adoption (see, *Matter of Podmore v Our Lady of Victory Infant Home,* 82 AD2d 48, 51). Virtually all surrenders of children for adoption by natural parents involve a high degree of mental and emotional stress and no rule of law requires that consents to adoptions shall be

given in an atmosphere free of such stress (*see, Matter of E.W.C.,* 89 Misc 2d 64, 72).

The natural parents' contention that they focused upon the judicial consent form as the operative instrument in this proceeding is belied by their act of filing a revocation of consent form. A formal revocation is patently unnecessary vis-à-vis a judicial consent form which has not been executed before a judge and is, in essence, therefore, a legal nullity (Domestic Relations Law § 115-b [1] [c]). The natural parents' resort to a revocation of consent form demonstrates, not a confusion about the dual forms, but rather a recognition of the operative effect of the extrajudicial consent which they had executed and which they apparently regarded as the paramount instrument. The purported revocation was, however, untimely, inasmuch as it was not received within 30 days of the commencement of the adoption proceeding (Domestic Relations Law § 115-b [1] [d] [i]).

With respect to the constitutionality of the statute, Judge Hurley properly found that the natural parents lack standing to raise the issue of the failure of the statute to require notification of the actual consequences of revocation of consent since the record reveals that they were not aggrieved by either the failure of the statute to require such information or by the fact that the extrajudicial consent form employed did not contain such information (*cf. Matter of Daniel C.,* 99 AD2d 35, *affd* 63 NY2d 927). In view of the language inserted by the natural parents on each of the consent forms, to wit, that they believed the adoptive parents were "far more capable of dealing with this condition and raising the child" than themselves, and given the often stated desire of the natural parents to proceed with the adoption as expeditiously as possible, it is evident that the extrajudicial consent form was knowingly and voluntarily executed and that it would have been executed even had the form contained a full explanation of the effects of revocation.

The second branch of the natural parents' constitutional challenge is that Domestic Relations Law § 115-b fails to require that they be given notice as to when the 30-day revocation period commences. I find this contention to be similarly unavailing. It bears noting that the attorney for the natural parents received notice on January 25, 1984, that a preliminary hearing with respect to the adoption was scheduled for March 1, 1984. Notwithstanding receipt of said notification, the Ks. did not formally revoke their consent to the adoption for more than 30 days after receipt of that notice. Under these circumstances, it is unnecessary to reach the issue of whether the failure of the

statute to direct that the natural parents be afforded notice of the commencement of the adoption proceeding renders the statute unconstitutional since there was here a lack of compliance with the statutory time provisions even after they received notice of the scheduled hearing (*see, Matter of Anonymous,* 55 AD2d 383, 385).

Although I do not find the extrajudicial consent form executed by the natural parents to have been invalid on its face (*cf. Dennis T. v Joseph C.,* 82 AD2d 125, *mot to dismiss appeal granted* 54 NY2d 1024, *lv denied* 55 NY2d 792; *Matter of Male M.,* 76 AD2d 839, *lv denied* 50 NY2d 1056), I am of the view that the due process rights of the natural parents may well have been violated and that, under the circumstances, the appropriate remedy was to treat as timely their belated attempt to revoke their consent to the adoption. That the presence of both of the statutorily authorized consent forms resulted in some confusion is undeniable. Due to the use of dual forms, a situation could have arisen whereby the natural parents would arrive in court on the date of a scheduled hearing only to be informed by the court that the extrajudicial consent form which they had previously executed had already become irrevocable, thus obviating the purpose of the hearing. At bar, the natural parents could reasonably have believed that they had until the day of the preliminary hearing to revoke their consent. To eliminate the injustice caused by any such possibility, the process that was due to the natural parents in this case was the best interests hearing which the Family Court properly ordered (*see, Matter of Anonymous,* 55 AD2d 383, 385-390 [Suozzi, J., dissenting], *supra*).

At the best interests hearing, evidence was adduced concerning the relative abilities of the natural and adoptive parents and their extended families to care for the child, the relative merits of the specialized schooling program in which the child is now enrolled vis-à-vis the program proposed by the natural parents, the presence or absence of normal siblings in the respective households to serve as role models for Sarah, the parties' relative financial circumstances, Sarah's developmental progress to date, and the character of and commitment of the respective parties to the child. Among the factors weighing in favor of the adoptive parents are their unequivocal acceptance of Sarah from the start, their successful experience in dealing with handicapped children, their proven ability to deal with Sarah's seizures and the active support of a grandmother who had been a teacher's aide in a BOCES program at the North Country Learning Center and a foster mother to a child with Down's

Syndrome. Among the factors weighing in favor of the natural parents are their superior financial resources and the presence of two normal siblings in their household to serve as role models for Sarah.

While I do not purport to be qualified to pronounce one of the educational programs the more worthwhile in all respects or to declare that one set of parents is apodictically more competent to care for the emotional, medical and physical needs of Sarah than the other, the findings of the trial court in such matters are entitled to great weight, particularly where, as here, those findings have a substantial basis in the evidence adduced (*see, Bunim v Bunim,* 298 NY 391).

With respect to the parties' remaining contentions, I note that the preponderance of the evidence standard was properly applied in this case. The "clear and convincing" evidentiary standard is mandated in State-initiated cases to terminate parental rights wherein "a near-equal allocation of risk between the parents and the State is constitutionally intolerable" (*see, Santosky v Kramer,* 455 US 745, 768). Unlike a neglect proceeding, a private placement adoption is not State initiated. The fact that the aid of the court has been invoked in an attempt to resolve this dispute does not suffice to convert an essentially private proceeding into a State-initiated one. The fact that the adoption was aided, in some measure, by Janet Marchese, a resident of Westchester County who voluntarily assists in the placement of Down's Syndrome children for adoption, and who is clearly not an "authorized agency" within the meaning of Social Services Law §§ 371 and 374, does not render it invalid (*see, Matter of E.W.C.,* 89 Misc 2d 64, 76, *supra; cf. Anonymous v Anonymous,* 108 Misc 2d 1098). Nor was the consent invalidated by the fact that the natural parents did not formally engage an attorney to represent them with regard to the adoption but, instead, relied in part upon the attorney for the adoptive parents. The natural father, who is himself an attorney, availed himself of the assistance of his law partner in handling certain details of the adoption. Although it is undisputed that neither Mr. K. nor his partner specialized in family law, it cannot be said, under the circumstances, that the consent was void due to lack of adequate counsel.

My decision herein does not contravene the fundamental tenet that the " 'right of the natural parents to the care and custody of their child' is 'basic' " (*Matter of Anonymous,* 55 AD2d 383, 385, *supra,* citing *Skinner v Oklahoma,* 316 US 535, 541). Although I bemoan the stringency of the statutory time requirements and

commiserate with the natural parents, I am also cognizant of the need to recognize the significance and finality of consents to adoptions. These consents, as the products of an ofttimes emotional and painful soul searching, cannot possibly be taken lightly. At risk is the welfare and emotional stability of an innocent and vulnerable infant, not to mention that of the adoptive family into which that infant has already begun to assimilate. Upon review of the evidence, I therefore decline to disturb the Family Court's decision, made after a best interests hearing, authorizing the adoption of Sarah by Mr. and Mrs. S.

Accordingly, I vote to affirm the dispositional order of the Family Court, Suffolk County, dated November 7, 1984, which, at the conclusion of the best interests hearing, refused to give effect to the notice of revocation of consent and, in effect, granted the adoption petition. However, I concur with my colleagues in voting to dismiss the appeal and cross appeal from the order dated September 24, 1984, inasmuch as no appeal lies as of right from a nondispositional order of the Family Court (Family Ct Act § 1112).

LAWRENCE, J., concurs with MANGANO, J. P., both noting that their votes to reverse the order dated November 7, 1984, are on the law; O'CONNOR, J., concurs separately in an opinion in which BROWN, J., concurs, both noting that their votes to reverse the order dated November 7, 1984, are on the law and the facts; WEINSTEIN, J., concurs to dismiss the appeal and cross appeal from the order dated September 24, 1984, but dissents as to the order dated November 7, 1984, and votes to affirm the same, with an opinion.

Appeal and cross appeal from a nondispositional order of the Family Court, Suffolk County, dated September 24, 1984, dismissed, without costs or disbursements.

Order of the same court, dated November 7, 1984, reversed, without costs or disbursements, nondispositional order dated September 24, 1984, vacated, it is declared that the judicial and nonjudicial consents to adoption signed by the natural parents were void *ab initio,* adoption petition denied, and matter remitted to the Family Court, Suffolk County, for the entry of an order in its discretion providing for the transfer of custody of the infant from the adoptive to the natural parents as expeditiously as possible.