■ In the Matter of SHAMELL J. and Another, Children Alleged to be Neglected and/or Abandoned. EUGENE C., Respondent; COMMISSIONER OF SOCIAL SERVICES, Respondent, and LENORE GITTIS, as Law Guardian, Appellant. [609 NYS2d 185] — Orders, Family Court, New York County (Judith Sheindlin, J.), entered on or about June 9, 1992, dismissing permanent neglect petitions against respondent Eugene C., are reversed, on the law and facts, to the extent appealed from and the matter remanded for a dispositional hearing before another Judge of the Family Court, without costs or disbursements.

On August 27, 1991, the Commissioner of Social Services of the City of New York filed petitions seeking to terminate the

respondent father's parental rights to his two sons, ages thirteen and fourteen, on the ground of permanent neglect and to obtain guardianship and custody of the children for the purpose of placing them for adoption (Social Services Law § 384-b [4] [d]). Petitions were also filed to terminate the parental rights of the children's mother on the ground of abandonment. The children had been placed in the Commissioner's custody in January of 1989 and were subsequently placed in foster care with their aunt, the respondent's sister. They have never lived with the respondent.

The respondent was personally served with notice of the fact-finding hearing but failed to appear. At the hearing, a caseworker with the New York City Child Welfare Administration testified that at the time the children were placed in foster care, he did not know how to contact the respondent and that although he subsequently located him, during the more than two and one-half years that the children had been in foster care, there was a period of more than six months during which the agency did not know the respondent's whereabouts because of his failure to provide the agency with his address. Despite the agency's efforts to have the respondent prepare for the discharge of his children to his care, he clearly indicated that he did not want custody. He never tried to secure a larger apartment that would accommodate them nor did he attend a parenting skills program in accordance with the caseworker's directions. Although the respondent was employed by the New York Telephone Company, he repeatedly told the caseworker that he could not afford to care for the children and did not want the responsibility. When asked why he could not provide financial support, the respondent stated that he was "involved with someone". The caseworker added that according to the foster mother, the respondent visited his children three or four times a month, and, at times, attended school functions. In response to the court's questioning, the caseworker stated that the aunt received kinship foster funds for the care of the children.

The Family Court granted the petitions terminating the parental rights of the mother but dismissed the permanent neglect petitions against the respondent declaring that the respondent and his sister were attempting to perpetrate a fraud. The Judge stated that the reality of the situation was that the respondent intended to remain as the children's father and participate in their lives without providing any financial support, preferring instead to let the State subsidize his sister, the foster mother, who would always be considered

the children's aunt. After railing against the government's failure to levy the respondent's wages for the support of his children while they were in foster care, the Judge dismissed the petitions, stating that she refused to countenance a fraud.

The Judge added that if the aunt were married, with a husband who intended to be the children's father and, presumably, who would support them financially, she would grant the petitions. However, she found the fact that the aunt was unmarried to be further evidence of the fraud, since if the petitions were granted, the respondent would still continue to be the children's father and the aunt would still be subsidized by the government. In response to the Law Guardian's argument that the children were being deprived of permanency and that the aunt intended to adopt them, the court told the Law Guardian to "bring in the father and let him surrender the children. I want to look at him. I'm not going to let them perpetrate this hoax on the court by just not showing up."

Assuming the court was correct in its assumption that the respondent was attempting to avoid his financial responsibilities to his children and that the Department of Social Services was not diligent in enforcing its child support policies, such failings do not constitute legal grounds for dismissing the termination petitions. Pursuant to Social Services Law § 384-b (4) (d), an order may be entered terminating parental rights upon the ground of permanent neglect. To establish permanent neglect, the petitioner Commissioner was required to prove that the respondent failed to maintain contact with or plan for the future of his children for a period of one year after the children came into the custody of an authorized agency despite the agency's diligent efforts to encourage and strengthen the parental relationship (Social Services Law § 384-b [7] [a]; *Matter of Gregory B.,* 74 NY2d 77, 86; *Matter of Star Leslie W.,* 63 NY2d 136, 140). However, notwithstanding these provisions, "evidence of diligent efforts by an agency to encourage and strengthen the parental relationship shall not be required when * * * The parent has failed for a period of six months to keep the agency apprised of his or her location" (Social Services Law § 384-b [7] [e] [i]; *Matter of Sheila G.,* 61 NY2d 368, 383, n 5; *Matter of Gyvon Lamar P.,* 190 AD2d 592, *lv denied* 82 NY2d 654; *Matter of O. Children,* 128 AD2d 460, 465).

It is undisputed that the respondent failed to keep the Department of Social Services apprised of his whereabouts for a period of at least six months and that although not required to do so, the agency made diligent efforts to assist him in

strengthening the parental relationship. However, any such efforts were thwarted by the respondent who was uncooperative and disinterested. Although he apparently visited his children on occasion, he refused to secure a larger apartment and enroll in parenting classes. The failure to plan realistically for his children's future alone supported a finding of permanent neglect (see, Matter of Star Leslie W., supra, at 142-143) and authorized the Family Court to terminate his parental rights and free the children for adoption (Social Services Law § 384-b; Matter of Gregory B., supra; Matter of Sheila G., supra; Matter of Ricky Ralph M., 56 NY2d 77).

The Family Court never addressed the sufficiency of the petitioner's proof. Instead, the Judge denied the petitions based on speculation as to the motives behind the respondent's actions. The termination petitions, however, were initiated by the Commissioner of Social Services, not the respondent. The inefficiency of the enforcement agencies responsible for collecting support from delinquent parents cannot form the basis for a finding that the children had not been permanently neglected. Regardless of the concern, the ground asserted for dismissal, to preclude the respondent from perpetrating a fraud on the court and the government, is not one provided in the Social Services Law. The fact remains that these children were permanently neglected as defined by statute, warranting termination of the respondent's parental rights.

Although termination would pave the way for adoption and allow the children to grow up in a permanent home, the Family Court determination will, instead, leave them in a permanent state of foster care, in contravention of the Legislature's intent as expressed in section 384-b. " '[T]he Legislature in section 384-b clearly did not contemplate foster care as a permanent condition, or even a desired goal for the long, indefinite duration, because prolonged foster care is not in a child's best interests. The Legislature found that unnecessarily protracted stays in foster care deprive children of positive, nurturing family relationships, and therefore—by section 384-b—it provided timely procedures for termination of parental rights, thus furthering the best interests, needs and rights of the child by freeing the child for adoption. In connection with parental termination, in this State, foster care is viewed as a temporary way station to adoption or return to the natural parents, not the purposeful objective for a permanent way of life' " (Matter of Gregory B., supra, at 90, quoting Matter of

*Joyce T.,* 65 NY2d 39, 47-48; *see also, Matter of Crawford,* 153 AD2d 108).

Since it is clear that the respondent cannot or will not provide a stable permanent home for his children, a permanent alternative home should be sought for them *(see,* Social Services Law § 384-b [1] [a] [iv]; *Matter of Gregory B., supra,* at 90; *Matter of Joyce T., supra,* at 47). A primary purpose of the statute is to provide "a fair and timely basis to free a child for adoption" and when continued foster care is not an appropriate plan, the statute requires that such permanent home be sought *(supra,* at 47).

All children should have stability in their lives. They should have permanent homes. If their birth parents are permanently neglectful, they should know the security of being wanted, loved, and cared for by adoptive parents. The motives driving the actions of their birth parents should not be permitted further to damage the unfortunate children who are already suffering the pains of permanent neglect. The "fraud" of the father should not be visited upon his sons by condemning them to the limbo of permanent foster care and depriving them of any opportunity for a permanent home.

The dissent sets forth a number of uncontested facts in this case. The father *is* abdicating his responsibilities and the City Department of Social Services obviously has not done its job in obtaining support from this man, accurately called a "deadbeat".

However, this does not justify thrusting upon the court the role of Chancellor of the Exchequer when our legal responsibility must be that of loco parentis.

An attempt to give stability to two young teens in a permanent adoptive home with their aunt is not just a "shibboleth" having no relevance to reality. Since this Court acts in the place and stead of the parents of these children, the situation of the *children* must govern our decision, not the fact that the father is a "deadbeat dad" or the City doesn't do what it should to recoup payments from him for the children's support.

The dissent notes the new City Administration's practice of fiscal responsibility. We applaud that posture and wish the City well in getting every dollar due the public (including monies this father legally and morally is obligated to pay). Acting as a collection agency for the City, however, with no regard for the best interests of the children, is not *our* constitutional or statutory role and function. Concur—Rosenberger, J. P., Wallach and Asch, JJ.

Kupferman, J., dissents in a memorandum as follows: Previously we affirmed for the reasons stated by Judge Judith Sheindlin of the Family Court and we added, "as indicated by the Trial Court, any contrary result would be a hoax and fraud on the Court." (NYLJ, Dec. 20, 1993, at 27, col 2, herewith recalled and vacated *[infra].*)

Justice Presiding Rosenberger dissented in a well written, but flawed opinion.

This Court now grants reargument on the petition of the Juvenile Rights Division of the Legal Aid Society, surprisingly (given the new City Administration's posture of fiscal responsibility) supported by the City Department of Social Services, does an abrupt about-face, and directs a new dispositional hearing before another Judge.

We have here the classic case of a deadbeat father whose parental rights regarding his two sons, then aged twelve and thirteen, were, in 1991, sought to be terminated by the Commissioner of Social Services *(cf.,* Carrieri, *Dispositional Hearings In Abandonment Proceedings,* NYLJ, Jan. 26, 1994, at 1, col 1).

The children had been placed in the Commissioner's custody in 1989 and placed, at public expense, in foster care with their aunt, the respondent's sister. It is appropriate at this point to refer to the nonprofit Citizens Budget Commission report this past January which indicated that the State of New York is ranked 47th among the 50 States in collecting child support payments *(see, Deadbeat Parents Target of State Bill,* New York Newsday, Feb. 4, 1994, at 8, col 1). Moreover, there is a movement to federalize the job of "Getting [kids] off the public dole by forcing the 'deadbeat dads' to pick up the tab" *(IRS to Collect From Dad?,* Natl LJ, Sept. 13, 1993, at 1, col 1, at 35, col 2).

The perspicacious Family Court Judge, in her decision, stated:

"Let me speculate * * * why the father failed to attend the court hearing. * * * This case involves not the status of children. This case involves money with regard to the father. He intends to remain their father. He intends to continue to participate in their life, according to [the Child Welfare Administration caseworker]. He intends to continue to see them regularly. He intends to do all those things. What he doesn't want to do is have to support his children. He'd prefer the State to support his children.

"The children live with his sister. He has absolutely no

incentive to contribute to the support of his children, and if there is a subsidized adoption in this case—and if I do terminate his parental rights, what's going to happen is, he's going to continue to do exactly as he's been doing, totally unencumbered by any fiscal responsibility for supporting the children who he made. And he will enjoy all of the privileges of being a parent. That is, he will see them when he wants to see them. He'll visit them when he wants to visit them. And the status of the children will not be changed. They will be living with their aunt, who they will still know as their aunt. And they will continue to see their father who they will still know as their father. That's what this case is all about. * * * And that is why the father did not appear. He's very happy with the sister getting kinship foster funds.

"Do you know why New York State has failed to levy his wages at 33⅓ percent for the support of these children while they were in foster care? Because the City [h]as failed to put a mechanism in this case to do that. That's why we can't afford to do anything in this [C]ity—because the City doesn't do what they're supposed to do to recoup from people who are supposed to pay for their children's support.

"And I do not intend to let this man get away with it by granting your petition with regard to him. I will grant the petition with regard to the mother, who apparently has in fact no contact with the children. Doesn't visit them. Doesn't see them. But I am not granting the petition with regard to the father. Because it's a farce. It's a hoax. And when I swore my oath of office, I believe that in that oath of office I am required not to permit hoaxes or fraud to be perpetrated upon the courts and governmental agencies and that's exactly what this is with regard to the father."

We have here a father who can, but does not want to, support his two sons and with the connivance of the Department of Social Services, under the guise of enforcing the Social Services Law, would allow termination of the relationship so that the sons can be adopted. Adopted by whom?

The children, now some 14 and 15 years old, are with the aunt at taxpayers' expense. If she wants to adopt them and take on the responsibility, the father can appear, as the Family Court Judge proposed, and agree to the adoption.

Given the way the Department of Social Services operates, this father will be able to "eat his cake and have it too." The children can live with the aunt at public expense while shibboleths about "permanent homes" and "stability" and the

"letter and spirit of the Social Services Law", having no relevance to the actual situation or to reality, are repeated in this Court's opinion.

Motion insofar as it seeks reargument is granted, and, upon reargument, the prior unpublished decision and order of this Court entered on December 16, 1993 (Appeal No. 50160) is recalled and vacated, and a new decision and order substituted therefor. [Kupferman, J., dissents and would deny reargument.] That portion of the motion insofar as it seeks leave to appeal to the Court of Appeals is denied.