OPINION OF THE COURT
Guy P. DePhillips, J.
The instant termination of parental rights proceeding was commenced by the filing of a petition on January 26, 1995. On March 23, 1998 the court issued a fact-finding determination based on clear and convincing evidence that the child Terrance G. was permanently neglected by his parents. As mandated by statute, the court set the matter down for a dispositional hearing.
The following testified at disposition: Ms. Laurence Freycinet, caseworker for St. Christopher-Ottilie, Serena G., natural mother, and Michael D., natural father of the subject child. All three are found by the court to be very credible. Based on their testimony the court finds that the respondent parents are presently fit to parent Terrance and are willing to parent Terrance, that the foster mother is fit to parent Terrance and willing to parent Terrance, that Terrance’s special needs are not beyond the capabilities of the foster mother to meet and not beyond the capabilities of the natural parents to meet; that Terrance is bonded to his natural parents and to his foster mother; the natural parents maintain regular and consistent visitation with their son and the return of Terrance to the custody of his parents would not be a danger to the child. Terrance was born June 14, 1992. Ms. Freycinet testified that the foster mother, now 57 years of age, took Terrance into her home to maintain sibling and family relationships. Terrance, now nine years old, maintains a sibling relationship with his sisters, Syretta, now age 10, and Seneida, with the assistance of the foster mother and the natural mother.
It is the caseworker’s view regarding termination that Terrance is “probably better oif with the foster mother. He’s been in this home [since March 17, 1995] and she has been involved in his life.” The caseworker described the relationship between Terrance and the respondent father in “glowing” terms: the father maintains consistent biweekly visits, is always on time, interacts appropriately with the child, helps his son with homework, plays with his son, and is patient and able to engage and maintain the child’s focus despite Terrance’s hyperactivity. In this regard, the father’s ability, according to *226 the caseworker, is superior to both the foster mother and the natural mother. The bond between the child and the father is described as “strong.” The father is permitted to take his son out for visits and there is never a problem. The child is described as enjoying the visits and calls his father “daddy.” They are affectionate. The caseworker also stated that her observations in these respects are corroborated by the foster mother.
The caseworker stated that in 1998, she complimented Terrance’s mother, Serena G., “on finishing the program and doing well and getting her life back on track.” All drug screening tests for the father were negative. The father completed a drug rehabilitation program. With respect to the child’s hyperactivity, both expressed wariness of medication, but were not unalterably opposed. The caseworker acknowledged that both parents always expressed the desire that their child be returned to their care and were visibly upset by the agency determination to seek termination. She further acknowledged that she never engaged the father in planning for the return of the child. She declared: “This case has been honestly very difficult to work with. I’ve been doing this for four years [inaudible] and a lot of times I feel torn. I feel torn where there is a parent who is really getting their act together now and a parent who did not get their act together in the past. I always feel like I’m caught in the middle. Why didn’t I discuss it? I can’t even answer you for sure. It wasn’t to hold against them. It was just something I did not do.” (Emphasis added.)
Parenthetically, the court recognizes in the utilization of the word “tom” the engagement of the humanity of the caseworker and respects her for this (cf. Matter of Tiffany A., 242 AD2d 709 [2d Dept 1997]).
When the foster mother took another foster child into the home who was overly aggressive towards Terrance both mother and foster mother appropriately responded to this crisis. The caseworker testified that the birth mother entered an alcohol rehabilitation program in January 1997, and successfully completed same. Subsequent to that event, Terrance’s mother attended and continues to attend AA meetings. In January 1997, regular visitation between Terrance and his parents commenced and has remained consistent to date. Sibling visitation has not only been maintained, but Terrance has participated in family gatherings at the home of his parents. Terrance’s mother attended his kindergarten graduation. The parents are invited by the foster mother for Terrance’s birthday parties. *227 The foster mother is a single parent. The caseworker stated that on occasion she would involve the respondent mother in decision making respecting Terrance’s medication, but that it was primarily the foster mother who kept the birth mother up to date on what was going on. She further testified that the parents have cooperated and responded with respect to their son’s medical needs. Usually it was Terrance’s mother who came and signed the necessary consents because the father was at work.
While appearing to fault Terrance’s mother for not going to more of his medical appointments and not going to his therapy, the caseworker acknowledged that she never invited the mother to come to these appointments. Again, it was the foster mother who gave encouragement to the natural mother! The caseworker also characterized the mother’s ability to respond to and control her son’s acting out behavior as “pretty okay.” In eloquent testimony, the caseworker described the foster mother’s compassion for Terrance and his parents as follows: “Her concerns were that now that the parents are getting their lives together and if she adopts you know, where would the parents be. That was her concern * * * I’m a foster parent who is adopting and these parents are getting their lives together. She felt a little bit uncomfortable about the whole thing and that’s how I remember it, in their getting their lives together and I’m going to adopt. I’m like taking their child away from them.” The natural mother and father have known each other for some 18 years and wed in 1999. They purchased a one-family home in Queens and moved in on April 10, 2000.
The respondent mother stated that March 10, 1997 was the last time she had an alcoholic beverage to date. She completed an alcohol rehabilitation program, attends AA meetings on a regular basis and abides by the “twelve steps.” The respondent mother and father reflect awareness of their child’s current health concerns. In particular the relationship between the mother and foster mother appears most positive. On in-depth cross-examination by both counsel for the petitioner agency and especially by the Law Guardian, implicating the birth mother’s passive role in the child’s medical treatment while in foster care, the mother stated that she always listened to the caseworker and the foster mother and that if she was advised that she could have taken a more proactive role in the child’s life, she would have done so. While there is an implication in the record that Terrance is slow, there is no testimonial or documentary validity that he is retarded.
*228 The child Terrance has been in foster care since birth, having been removed from his mother’s custody after birth. He is now nine years of age and has been continuously in his present foster home for the past six years. Indeed it is due in many respects to the active role of the foster mother in maintaining a viable relationship between Terrance and his biological parents that bonding between the child and his parents clearly exists today.
In some respects his foster mother was more active than the agency in this regard. The cooperation between the natural parents and the foster mother not only is laudable, in the life experience of this child it is a vindication of the foster care system and the public policy of the State of New York. This record amply demonstrates the love Terrance’s parents have for him and the love of his foster mother for him, which love does not exclude the reality of the parental love, and does not serve or seek to frustrate that love, but encourages it.
Significantly Ms. Freycinet admitted during cross-examination that the parents have made advancements in following Terrance’s treatment and are consistently and continuously visiting their son on a regular basis. To her credit, Ms. Freycinet acknowledged that Terrance’s mother and father have rehabilitated themselves. The Law Guardian inquired if the length of time Terrance has stayed in the same foster home is a factor. The caseworker responded:
“It is an issue, but when you have a mother and father who visits on a regular basis and there is a bonding, I mean even it didn’t happen before in his life, in the last three years [since January 1997 approximately] there have been constant visits. In some cases you can look at that and say maybe the child go home [sic]?
“Law Guardian: But not in this particular case?
“Ms. Freycinet: No.”
The ambivalence of the caseworker is best summed up in the following exchange, again on cross-examination by the Law Guardian:
. “Q. How many years have you been doing what you do now?
“A. Too long, ten.
“Q. Ten years, is that already too long. And in that, in that length of time I take it that you’ve dealt with many, with many kinds of similar situation to the one we’re dealing here; is that correct?
“A. Yes. However, this is the first case I’ve had with this— where the parents really turned their life around.”
*229 Preliminarily to rendering conclusions of law, the court states the following apologia: the robe of justice worn by judges and justices of the Unified Court System of the State of New York, whether at the trial or appellate level, is seamless; with the power to adjudicate comes the responsibility; in the civil area as pertains to family law, we engage and are required to engage our humanity as well as our legal knowledge and experience; the term “termination of parental rights” implicates the permanent severing of the legal relationship of parent to child and of child to parent; a proceeding to terminate parental rights is not a custody proceeding and not merely a custody determination; the determination to terminate parental rights in the civil area is the jurisprudential equivalent of capital punishment in the criminal area — the declaration in legal terms of the death of the biologic child to the biologic parent, and the death of the biologic parent to the biologic child; the courts, the judicial branch of government, must be mindful of the public policy of the State of New York as declared by the legislative branch of government; that individuals privileged to wear the robe of justice be willing to educate and be educated when the need to be educated is appropriate and necessary; that due process for the parent be recognized as due process for the child; and that the signifier of an educated person resides in the Platonic characterization of the educated as one who knows that he or she does not know.
What is the burden of proof at the dispositional phase of a termination of parental rights proceeding founded on a petition alleging permanent neglect? The court must hold a dispositional hearing where the petition alleges and the court finds at the fact-finding phase that the respondent parent has permanently neglected the subject child or children unless there is also a fact-finding of abandonment, mental illness or mental retardation or the parties consent to dispense with the dispositional hearing. (Family Ct Act § 625; Matter of Dlaine Bernice S., 72 AD2d 775 [2d Dept 1979]; Matter of Kenny D. C., 79 AD2d 1024 [2d Dept 1981].) Conversely, on all grounds other than permanent neglect, the court may dispense with a dispositional hearing in the exercise of discretion with one exception— termination of parental rights based on the child’s being severely or repeatedly abused by his or her parent (Social Services Law § 384-b [8]). Accordingly where a child has been permanently neglected or severely or repeatedly abused by the parent, a dispositional hearing is mandated. This is a critical distinction.
*230 While parental rights may be terminated on the basis of abandonment, mental illness or mental retardation alone, such rights may not be terminated on the basis of permanent neglect or severe or repeated child abuse alone. To terminate in these instances requires in addition to the fact of such permanent neglect or severe or repeated child abuse, a determination that such termination is warranted in the child’s best interests. The statute makes clear that respecting severe or repeated child abuse by a parent, termination of parental rights may only occur on a best interests of the child determination at a dispositional hearing based on clear and convincing evidence (Social Services Law § 384-b [8] [c]).
“Termination of parental rights may be based only on a specific ground provided for by statute. Unlike a custody determination, parental rights may not be terminated solely because it is perceived to be in the best interest of the child” (19B Carmody-Wait 2d, NY Prac § 119A:609, at 606 [rev ed] [emphasis added]). “Of the permissible dispositions in a termination proceeding based on permanent neglect (see, Family Ct Act § 631), the Legislature — consistent with its emphasis on the importance of biological ties, yet mindful of the child’s need for early stability and permanence — has provided for a suspended judgment, which is a brief grace period designed to prepare the parent to be reunited with the child (Family Ct Act § 633)” (Matter of Michael B., 80 NY2d 299, 310-311 [1992] [emphasis added]). The biological ties referred to are the tie of parent to child and the tie of child to parent. Simply stated: the court must be mindful that in terminating the parental rights of the parent to the child, the court is also terminating the child’s rights to the parent. The term parent implies child and the term child implies parent.
Common sense, right reason, respect for constitutional law and the engagement of one’s humanity compels recognition that two factual findings are required in this termination of parental rights proceeding to justify termination of such rights — a fact-finding of permanent neglect and a fact-finding that the child’s best interests requires such termination. Termination proceedings are not custody proceedings — the goal is not custody, but to make the child a child of a legal stranger (see Matter of Corey L v Martin L, 45 NY2d 383, 391 [1978]). If, for purposes of determining mere custody, the best interest of the child would not permit a parent to be displaced in the absence of extraordinary circumstances, a complete termination of parental obligations and rights is not to be attained on *231 any less grave consideration. This grave consideration is encapsulated in the clear and convincing evidence burden of proof standard. “The filial bond is one of the strongest, yet most delicate, and most inviolable of all relationships, and in dealing with it we must realize that a child is not a mere creature of the State for distribution by it (cf. Pierce v Society of Sisters, 268 US 510, 535). This is not a new problem. It is fraught with emotion, impossible to compromise and one in which the stakes are ídgh. There has always been abiding respect for the rights of natural parents (see People ex rel. Kropp v Shepsky, 305 NY 465, 468-469; Matter of Livingston, 151 App Div 1, 7). On the other hand, there is a co-ordinate need to protect children. Certainly, the amendments to section 111 of the Domestic Relations Law (L 1975, ch 704, § 3; see, also, L 1976, ch 666) may be viewed as an expression of a desire to move the courts away from a perceived tendency to favor the residual rights of abandoning parents to the detriment of the child. Nevertheless, the statute should not be so broadly applied that it establishes a preference. A termination of parental rights is a drastic event indeed, so much so that it raises questions of constitutional dimension (see Matter of Goldman, 41 NY2d 894, 895 * * * Matter of Bennett v Jeffreys, 40 NY2d 543, 548 * * *)” (Matter of Corey L v Martin L, 45 NY2d 383, 392, supra). The caveat that a child is not a “mere creation of the State for distribution by it” binds all three branches of State government — the executive, the legislative and the judicial. To the extent that the State perceives however delicately or indelicately that a child is a prize or a gift to be distributed, the child is reduced to a chattel and dehumanized. The occasion of the termination of parental rights is not an occasion of triumph and unalloyed joy.
It is the occasion of recognition of a failed parent-child relationship, of a failed humanity.
The importance and necessity of the second fact-finding as to the child’s best interest with respect to the initial fact-finding of permanent neglect is statutorily delineated in Family Court Act § 631. This enactment provides that at the conclusion of the dispositional phase or hearing in the proceeding,
“the court shall enter an order of disposition:
“(a) dismissing the petition in accord with section six hundred thirty-two; or
“(b) suspending judgment in accord with section six hundred thirty-three; or
“(c) committing the guardianship and custody of the child in accord with section six hundred thirty-four.
*232 “An order of disposition shall be made, pursuant to this section, solely on the basis of the best interests of the child, and there shall be no presumption that such interests will be promoted by any particular disposition” (emphasis added).
This language which embraces no preference for any disposition, that is, no preference for dismissal, no preference for termination, no preference for suspended judgment, is subtly transmuted by judicial dictate to read abstractly that “[t]here is no presumption that those interests [the child’s best interests] will be served best by return to the parent” (Matter of Star Leslie W., 63 NY2d 136, 147-148 [1984]; see Matter of Celeste M., 180 AD2d 437 [1st Dept 1992]). To balance the dialectic, there is no presumption that the child’s best interests will be served by termination of parental rights, i.e., committing the guardianship and custody of the child in accord with Family Court Act § 634. It is one thing to state that there is no presumption as to any particular disposition, it is something else to single out one aspect of the “no presumption” and by silence implicate or infer a preference favoring termination. That silent preference may artfully be clothed with language that there is no guarantee that a rehabilitated parent, a contemporaneously fit parent, will not relapse in the future into drug use, alcohol use, the occasion of the prior neglect and the child’s entry into foster care. The public policy of the State of New York, the Constitutions of the United States and the State of New York and the statute make no such demand. The burden of proof by the negative is impossible of fulfillment.
In the law of termination of parental rights and especially as applies to permanent neglect as defined in Social Services Law § 384-b, where at disposition it is determined that the parent is willing and able to provide proper care, the State may not and cannot justify termination of parental rights because it has found a “better” parent for the child (Matter of Ricky Ralph M., 56 NY2d 77, 83 [1982]; Matter of Sanjivini K., 47 NY2d 374, 382 [1979]; contra Matter of Tiffany A., 242 AD2d 709 [2d Dept 1997]).
In Santosky v Kramer (455 US 745 [1982]), the Supreme Court of the United States held that the Due Process Clause of the Fourteenth Amendment of the United States Constitution demands that before a State (specifically New York) may sever completely and irrevocably the rights of parents in their natural child, the State must support its determination to terminate such rights by “at least clear and convincing evidence.” The Supreme Court recognized that New York bifurcates its per *233 manent neglect termination of parental rights proceeding into “fact-finding” and “dispositional” hearings. It further recognized that termination denies the natural parent physical custody, as well as the rights to even visit, communicate with, or regain custody of the child. The Court noted: “The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life. If anything, persons faced with forced dissolution of their parental rights have a more critical need for procedural protections than do those resisting state intervention into ongoing family affairs. When the State moves to destroy weakened familial bonds, it must provide the parents with fundamentally fair procedures” (Santosky v Kramer, supra at 753-754 [emphasis added]). It further observed, citing Addington v Texas (441 US 418, 423): “The function of a standard of proof, as that concept is embodied in the Due Process Clause and in the realm of fact-finding, is to instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication” (Santosky v Kramer, at 754-755 [internal quotation marks omitted]). In unequivocal language of constitutional magnitude, the United States Supreme Court declared: “In parental rights termination proceedings, the private interest affected is commanding; the risk of error from using a preponderance standard is substantial; and the countervailing governmental interest favoring that standard is comparatively slight. Evaluation of the three Eldridge factors compels the conclusion that use of a ‘fair preponderance of the evidence’ standard in such proceedings is inconsistent with due process.” (Santosky v Kramer, supra at 758.)
Echoing common sense and in accord with pronouncements of New York’s Court of Appeals the Supreme Court noted that once affirmed on appeal, a New York decision terminating parental rights is final and irrevocable and that “[flew forms of state action are both so severe and so irreversible” (at 759).
The appellate courts in New York continue to invoke a preponderance of the evidence standard at the dispositional phase of a termination of parental rights proceeding founded on permanent neglect. Under New York law the court is required to make an additional fact-finding to justify this most *234 severe and irreversible exercise of state action — the declaration of termination of parental rights. Again, the Appellate Division suggests that a preponderance standard properly allocates the risk of error between the parents and the child. As noted by the United States Supreme Court in Santosky, this assumes that termination of parental rights invariably will benefit the child. This sophism is annihilated by the simple, commonsense, reasoned and natural response of the Supreme Court in its pithy observation: “we have noted above that the parents and the child share an interest in avoiding erroneous termination” (Santosky v Kramer, supra at 765 [emphasis added]). This sane and salutory tenet is further amplified by the Court’s allusion to Addington: “ ‘The individual should not be asked to share equally with society the risk of error when the possible injury to the individual is significantly greater than any possible harm to the state.’ 441 U.S., at 427, 99 S.Ct., at 1810. Thus, at a parental rights termination proceeding, a near-equal allocation of risk between the parents and the State is constitutionally intolerable” (Santosky v Kramer, supra at 768).
In the instant proceeding the testimony and evidence at the dispositional hearing discloses that both natural parents in an intact family unit are fit and willing to parent their child Terrance at the present time. Similarly the foster mother, a single foster parent, is fit and willing to parent Terrance. Terrance is bonded to his foster mother. Terrance is bonded to his natural mother and natural father. Given these circumstances, what is in Terrance’s best interests? Guidance as already noted best comes from the Court of Appeals. In Matter of Ricky Ralph M. (56 NY2d, supra at 80-81, 83), the Court stated:
“a sense of order calls upon us to identify some distinctive characteristics of the two legal concepts, custody and parental rights, which here seem to have beeii so unceremoniously run together.
“Custody is dominated by concern for the best interest of the child (see Friederwitzer v Friederwitzer, 55 NY2d 89, 95; Matter of Nehra v Uhlar, 43 NY2d 242, 248; Domestic Relations Law, §§ 70, 240; 2 Foster-Freed, Law and the Family, § 29:5). Case law tells us that, where a battle for custody is waged between parent and a third party * * * the parent may not be denied custody absent a threshold showing of ‘surrender, abandonment, persisting neglect, unfitness or other like extraordinary cir *235 cumstances’ (Matter of Bennett v Jeffreys, 40 NY2d 543, 544). Obeisance to the parental relation is so strong that, even when ‘extraordinary circumstances’ do exist, this alone does not justify depriving the parent of custody. It does no more than trigger the ‘best interests of the child test.’ (Id., at p 548.) Even so, the underlying parental rights subsist.
“In contrast, the far more embracing matter of a judicial termination of parental rights is, as is legal adoption, a creature of statute (Matter of Malpica-Orsini, 36 NY2d 568, 570). When it is sanctioned, it ‘is both total and irrevocable. Unlike other custody proceedings, it leaves the parent with no right to visit or communicate with the child, to participate in, or even to know about, any important decision affecting the child’s religious, educational, emotional, or physical development’ (Lassiter v Department of Social Servs., 452 US 18, 39 [Blackmun, J., dissenting]; see Domestic Relations Law, § 117). For all practical purposes, the parent no longer exists. In producing this result, it cuts across a norm of nature as instinctive and as fulfilling as only procreation and the ensuing bond between parent and offspring can be (Developments — The Family, 93 Harv L Rev 1156, 1351). As the majority put it in Lassiter, ‘[a] parent’s interest in the accuracy and justice of the decision to terminate his or her parental status is, therefore, a commanding one’ (452 US, at p 27) and may not be accomplished without stern adherence to the dictates of due process (see Santosky v Kramer, 455 US [745]) * * *
“The Legislature, the progenitor of law bearing on termination of parental rights, was not unaware of the importance of those rights in enacting a statute as specific as section 384-b of the Social Services Law. Its accompanying statement of legislative findings and intent includes the unsurprising observation that ‘it is generally desirable for the child to remain with or be returned to the natural parent because the child’s need for a normal family life will usually best be met in the natural home, and that parents are entitled to bring up their own children unless the best interests of the child would be thereby endangered’ (§ 384-b, subd 1, par [a], cl [ii]). In this connection, recognizing that parents, *236 like children, and like human beings generally, come in all ranges of perfection and imperfection, we have made it clear that, under our legal system, the State does not seek to 'find “better” parents for a child even though the natural parents may be willing and able to provide proper care’ (Matter of Sanjivini K., 47 NY2d 374, 382). The security of the family institution and constitutional principle require no less (see Stanley v Illinois, 405 US 645, 651, supra).
“By no means does the statute encourage a court * * * to back into a parental termination decision.” (Emphasis added; contra Matter of Tiffany A., 242 AD2d 709 [2d Dept 1997].)
The child is not the child of the State. If the State in an act of hubris perceives the child as the child of the State to be distributed or given by it at will, the State cheapens life and strips the child of humanity. Thankfully, with circumspection and compassion the legislative and executive branches of government respect the humanity of the child in their policy declaration set forth in Social Services Law § 384-b entitled “Guardianship and custody of destitute or dependent children; commitment by court order”:
“1. Statement of legislative findings and intent.
“(a) The legislature * * * hereby finds that * * *
“(ii) it is generally desirable for the child to remain with or be returned to the natural parent because the child’s need for a normal family life will usually best be met in the natural home, and that parents are entitled to bring up their own children unless the best interests of the child would be thereby endangered * * *
“(iv) when it is clear that the natural parent cannot or will not provide a normal family home for the child and when continued foster care is not an appropriate plan for the child, then a permanent alternative home should be sought for the child.
“(b) The legislature further finds that many children who have been placed in foster care experience unnecessarily protracted stays in such care without being adopted or returned to their parents or other custodians. Such unnecessary stays may deprive these children of positive, nurturing family relationships and have deleterious effects on their *237 development into responsible, productive citizens. The legislature further finds that provision of a timely procedure for the termination, in appropriate cases, of the rights of the natural parents could reduce such unnecessary stays.
“It is the intent of the legislature in enacting this section to provide procedures not only assuring that the rights of the natural parent are protected, but also, where positive, nurturing parent-child relationships no longer exist, furthering the best interests, needs, and rights of the child by terminating parental rights and freeing the child for adoption.” (Emphasis added.)
This policy based on reason and shared humanity is endorsed the decisions of the State’s highest court — the Court of Appeals (see Matter of Michael B., 80 NY2d 299 [1992]; Matter of Corey L v Martin L, 45 NY2d 383 [1978]; People ex rel. Kropp v Shepsky, 305 NY 465 [1953]; Matter of Goldman, 41 NY2d 894 [1977]; Matter of Bennett v Jeffreys, 40 NY2d 543 [1976]; Matter of Ricky Ralph M., 56 NY2d 77 [1982]; Matter of Sanjivini K., 47 NY2d 374 [1979]). This policy, this reason, this humanity, this teaching is at risk, however, in this court’s view, at other levels of the judicial process. The Appellate Division has extraordinary review power not shared by the Court of Appeals. It is the ultimate finder of fact on appeal. Therefore, if the issue of law, the question of law, the public policy is perverted, there is no justice and no good, merely the semblance of justice and the good, the rhetoric of compassion devoid of compassion, the invocation of the best interests of the child devoid of the best interests of the child. This court is aware that it runs the risk of incurring the ire of the Appellate Division in making this pronouncement. In defense, this court avers that conscience, the oath of office, humanity, the desire for justice to prompt the good and be witness to the truth — will this act.
Instructed by the teachings of the Court of Appeals above noted and the United States Supreme Court in Santosky, and based upon the factual findings of this court at disposition, it is concluded on the law that the petition be dismissed. There is no showing by clear and convincing evidence that it is in Terrance’s best interests that the parental rights of his parents and his conjoint right to them be terminated. However, the teaching of the Appellate Division, Second Department, in Matter of Tiffany A. (supra) appears to mandate a different result, to wit, the termination of the parental rights of Terrance’s parents. Laudable though the achievements of Terrance’s *238 mother and father are, the foster mother is at least an equal custodian. Echoing the rationale of Tiffany A., Terrance’s well-being is too important to gamble that the parents will continue in their fitness and will not relapse. Since it was this court’s determination in Tiffany A. (supra) that was reversed on the law, but not on the facts, it is incumbent for this court to demonstrate that it is educable. The decision and order of this court in Tiffany A. (docket No. B-188/94) consisted of 74 pages. The transcript of the dispositional hearing comprised 3,580 pages over a time frame of 16 months in which 19 witnesses inclusive of the parties were called. The dispositional hearing was exceptional for six critical events which appear not to have entered into the Appellate Division’s determination at all: first, the State in the person of petitioner agency wished to withdraw the petition to terminate at the commencement of disposition based on the rehabilitation of Tiffany’s mother, her ability and willingness to parent and her full cooperation in maintaining visitation and planning for the return of her daughter; second, the Law Guardian for the child took the position at the inception of the dispositional hearing that parental rights shall be terminated without any evidence being yet adduced; third, the State in the person of the petitioner and Tiffany’s mother moved to remove the Legal Aid Society as Law Guardian on the basis of bias, prejudice and prejudgment; fourth, the pattern of bringing successive differing allegations of neglect against Tiffany’s mother throughout the lengthy course of the dispositional hearing by the Law Guardian, all of which were amply investigated, and determined to be unfounded and all of which were fully “aired” on the record; fifth, the implication of parental unfitness demonstrated by the foster parents in being the source of these allegations and persisting in same even after admonishment by the court; sixth, that after the filing of the termination petition due to the birth mother availing herself of the opportunity to plan for the return of her daughter with the approval and cooperation of the agency, a disparate goal was de facto being pursued by the biological father and the foster parents without the knowledge of the agency, to wit, open adoption without benefit of legal sanction.
The Appellate Division mischaracterized this court’s determination as releasing the child to the full-time custody and care of her mother. In fact, legal custody throughout the dispositional hearing before this court and during the appeal continued to be with the Commissioner of Social Services under the continuing placement order in the article 10 proceeding. *239 The decision of this court was viewed by the appellate court as not being “even-handed balancing of whether Tiffany would be better served by being adopted by the foster parents rather than being returned to the mother” (Matter of Tiffany A., 242 AD2d 709, 711). The phrasing of the sentence implicates the result desired by the appellate court and its reliance on the Law Guardian’s position that the fact-finding of permanent neglect warrants termination of a parent’s rights so long as the child is bonded to the foster parent and the foster parent is as fit as or a more fit custodian regardless of any steps at rehabilitation engaged in by the child’s parent. The appellate court faulted this court for failing to suspend judgment “so as to enable the mother to continue with her rehabilitation and to demonstrate her ability to be an effective parent subject to terms and conditions ensuring Tiffany’s safety” (Matter of Tiffany A., 242 AD2d 709, 713). Overlooked was this court’s statement in its decision and order that “almost two years later and upon a detailed and voluminous record, the wisdom of the petitioner’s view has been vindicated. The passage of time from the commencement to the closing of testimony at disposition under circumstances where the court approved of expanding visitation between the child and her mother has resulted in supervision and scrutiny of the mother’s conduct, her cooperation in planning for and meeting Tiffany’s needs and the evolving nature of the parent-child bonding. All these elements are integral to the parameters of suspended judgment for one year, had that been consented to at the time of commencement of the dispositional hearing. Circumstances were already in place at that time which would have formed an appropriate basis for consent and judicial imprimatur of a suspended judgment. Therefore from a practical and sound jurisprudential point of view, suspended judgment has been rendered academic as a possibility’ (decision and order of Dec. 6, 1996 at 69, docket No. B-188/94). The Appellate Division in its exercise of its fact-finding and law-finding power could have suspended judgment. It did not do so. While that Court characterized this court as not evenhanded, it demonstrated its own sense of balance, fairness and evenhandedness in reversing on the law, but not on the facts, and remitting the matter to Family Court before a different judge for “an expedited dispositional hearing” (Matter of Tiffany A., 242 AD2d 709, 715) with the following remarkable advisory opinion: “we find that on the instant record Tiffanys best interests would likely better be served by terminating the parental rights of both the *240 mother and. the father so as to enable the [foster parents] to adopt her” (id., at 714). The bias blatantly exhibited by the Law Guardian toward Tiffany’s mother was thus conjoined in by the Appellate Division. To justify this bias and as key to the rationale for the reversal, the appellate court alluded to the fact-finding of permanent neglect, the fitness of the foster parents and their desire to adopt, the bonding between foster parent and foster child and issued the following remarkable edict, awesome and terrifying in its implication for all children subject to termination of parental rights at disposition solely on a permanent neglect finding: “The mother, on the other hand, is, at best, learning to become a suitable parent for the first time * * * Laudable though her achievements may be, the evidence clearly demonstrates that the foster parents are the superior custodians. Tiffany’s well-being is too important to gamble that the mother will continue to progress and will not relapse (see, Matter of St. Vincent’s Servs. [Joseph Bernard H.] v Jean H., 211 AD2d 799).” (Matter of Tiffany A., 242 AD2d 709, 714 [emphasis added].) The case cited does not stand for the proposition urged. The proposition urged not only departs from “settled” law, it creates a presumption and a preference favoring foster parent over natural parent. It is the proposition which has motivated the Legal Aid Society Law Guardian from the inception of the dispositional hearing and deprived the child Tiffany in a real sense of effective legal representation. Rarely has this court been privileged to read so heartless an edict. It deprives the parent of hope. It deprives the child of hope. It deprives humanity of hope. That it comes from human fallibility rather than from godlike infallibility renders it no less unwise, no less an act of hubris.,That time may serve to illustrate its prophecy makes it no more real, no more good, no more just and no less alien to the humanism of western civilization. It is coarse, it is cruel and echoes the creed of predestination at variance with an ethos of redemption and forgiveness. That this edict issues from the Appellate Division startles, that it permeated the advocacy of the Law Guardian for the child from the inception of disposition prior to a record being made raises ethical overtones of the gravest consideration. The child was entitled to adequate and effective legal representation. If the child is not a mere creature of the State for distribution by it, if there is no presumption that the child’s best interest will be promoted by any particular disposition, if the State does not seek to find “better” parents for the child where the natural parent is able and willing to provide *241 proper care, if the parent and the child have a conjoint interest in avoiding erroneous termination, if due process mandates under the Constitution of the United States and of New York that the burden of proof is clear and convincing at termination proceedings based on permanent neglect and if the natural parent’s desire for and right to the companionship, care, custody, and management of his or her children is an interest more precious than any property right (Santosky, supra, citing Lassiter v Department of Social Servs., 452 US 18 [1981]), then where circumstances exist or arguably exist as to the birth parent’s actual rehabilitation at the inception of the dispositional phase of the termination proceeding, is it not requisite for the child’s advocate to protect the child’s possibilities, the child’s destiny, the child’s right to maintain the relationship to its parent, the child’s right to permanency, the child’s right to a new parent where the birth parent is failing the child?
In Tiffany A., the very fact that the petitioner wished to withdraw the petition at the commencement of disposition served to put the Law Guardian on notice as to the need for balance, fair judgment and the protection of the record regarding the dispositional possibilities for child.
As in Tiffany A. so now in Terrance G., this court is confronted with fit parent and fit foster parent, the child bonded to parent and foster parent, parent and foster parent willing to parent, the child being in the care of the parent posing no danger to the child, and the Law Guardian for the child advocating for termination of the parent’s right to the child and the child’s right to the parent and the adoption of the child by the foster parent. Based on the holding in Santosky and the case law from the Court of Appeals as noted above, this court holds that the burden of proof at a mandated dispositional hearing in a termination proceeding is clear and convincing evidence. At a dispositional hearing not mandated by statute, but held in the exercise of discretion, the burden of proof is preponderance of the evidence. Why? In the latter instances where the fact-finding determination is based on abandonment, mental illness, or mental retardation, the dispositional hearing is held in the exercise of discretion because the fact-finding itself is all that is legally required to justify termination (19B Carmody-Wait 2d, NY Prac § 119A:682 [rev ed]). Not so where the fact-finding is permanent neglect. Under the statute,
“[i]n order for a child to be deemed permanently neglected, the child’s parents must have failed to maintain contact with the child or to plan for the child’s future for a period of more *242 than one year following the date the child came into the care of an authorized agency.
“The statute contemplates a continuous period of one year at any time after the child’s placement with the agency. In other words, the period of neglect required to trigger the statute need not be the interval immediately prior to the filing of the [permanent] neglect petition but may embrace earlier periods of time” (19B Carmody-Wait 2d, NY Prac § 119A:612, at 613-614 [rev ed]).
“At the conclusion of a dispositional hearing on a petition to terminate parental rights on the ground of permanent neglect of the child, the court must enter an order of disposition. The order may either: (1) dismiss the proceeding for failure of proof; (2) suspend judgment; or (3) commit the guardianship and custody of the child for the purposes of freeing the child for adoption.
“Observation: The statutory scheme, that is, the authority to make any of the dispositions set forth above, and the further provision that no particular disposition is presumptively preferred and that the court must base its disposition on the best interests of the child, clearly recognizes the possibility that parents can grow to meet their parental responsibilities, so that a finding of permanent neglect does not automatically lead to termination of parental rights.” (19B Carmody-Wait 2d, NY Prac § 119A:685, at 710-711 [rev ed].)
“The petition must be dismissed if, at the dispositional hearing, the petitioner fails to prove that it is in the child’s best interests that guardianship and custody be committed to an authorized agency” (19B Carmody-Wait 2d, NY Prac § 119A:686, at 711-712 [rev ed]).
In termination of parental rights proceedings on permanent neglect, the destiny of the child is the issue at disposition. Cloaked in the statutory phrase “best interests of the child” is the invitation to the exercise of awesome power: to declare the parent dead to his or her child while living; to declare the child dead to his or her parent while living; to declare the parent-child relationship viable; to declare or require a failed humanity; to declare or recognize the humaneness of humanity; to reflect on love or the absence of love.[1] To treat that power cavalierly, to utilize it with presumption or with preference; to *243 exult in its form, but without substance; to rationalize prejudgment and garb it with platitudes; to insult without good cause; to judge where judgment is not called for; to particularize when comprehension of the whole is necessary; to fail to act when action is required is to corrupt that power and to be corrupted by it.
The legacy of Tiffany A. (supra), whose rationale if true and just mandates a different result than that concluded by this court for Terrance G. and whose jurisprudential approach is at variance with the sentiment and principles enunciated above, stands as mute coda to the proposition that a child is not property of the State to be distributed by it. The child stands again before this court, but on this occasion bears the name Terrance, not Tiffany. The single most remarkable factual distinction affecting the destiny of Terrance as compared to the destiny of Tiffany was the nature of the love exhibited by the respective foster parents. Terrance’s foster parent’s love admitted of and urged the rehabilitation of his parents. Tiffany’s foster parents’ love did not admit of and did not urge the rehabilitation of her mother. The legal representation afforded both children by the Legal Aid Society under circumstances where parental rehabilitation is not remote, but proximate, was essentially similar in terms of “policy.” The only antidote to such “policy’ and to the appellate court’s endorsement of such policy is recognition that the risk allocated between the State and the parent, between the State and the child, requires for simple and essential constitutional “due process” that the burden of proof at disposition on permanent neglect termination proceedings be clear and convincing evidence. Nothing in this analysis is intended to implicate that the Law Guardian for the child may not advocate for a particular dispositional alternative; *244 everything in this analysis is intended to implicate that the Law Guardian for the child must protect the child’s possibilities on the record especially where overtones of parental rehabilitation exist. As so eloquently observed by the Court of Appeals: “These are not merely technical rules involving statutory authority, nor are they based on the assumption that a parent’s rights and interests are superior to the child’s. A child, of course, is not a parent’s property, but neither is the child the property of the State (Pierce v Society of Sisters, 268 US 510, 535; Stanley v Illinois, 405 US 645). In many cases the State may, and under some legal systems undoubtedly does, find ‘better’ parents for a child even though the natural parents may be willing and able to provide proper care. But it is fundamental to our legal and social system, that it is in the best interest of a child to be raised by his parents, unless the parents are unfit (see, e.g., Matter of Spence-Chapin Adoption Serv. v Polk, 29 NY2d 196, 204; Matter of Corey L v Martin L, supra; Stanley v Illinois, supra)” (Matter of Sanjivini K., 47 NY2d 374, 382 [1979] [emphasis added]).
Reflecting on Matter of Tiffany A. (supra), prior reported cases and the position taken by the Law Guardian herein, this court perceives that the Legal Aid Society has adopted a policy at disposition after a fact-finding of permanent neglect. In its role as Law Guardian, where there are circumstances implicating parental rehabilitation, the Society’s position is that the child’s “best interests” are resolved solely by the determination that the foster parent is as fit or more fit than the child’s parent. This policy is urged under the guise of advocating the statutory direction of no presumption at disposition as to those best interests in observing that there is no presumption favoring the child’s parent. However, silence as to the equivalent statutory direction of no presumption favoring the foster parent is subverted into a subtle preference for the foster parent with the argument that regardless of the rehabilitation of the child’s parent, as long as the foster parent is more fit or as fit in the competing aspects of fitness, termination must occur. Clearly where the parent continues to be unfit, termination is warranted. Absent such circumstance the Society’s argument is specious, result-oriented and mischievous regarding its responsibility to its client, the child. The child has three possibilities at disposition: the dismissal of the petition in which event the parent-child relationship retains full jural recognition for both parent and child, child and parent; granting of the petition in which event the parent-child relationship is *245 terminated with no jural recognition and the child’s destiny residing in adoption; suspended judgment for one year with a possible further one-year extension under exceptional circumstances to permit and authorize a grace period for the parent and child, the child and parent to continue to enjoy jural recognition of their relationship. At the conclusion of this grace period, the petition is either granted or denied as circumstances and the rule of law warrant. Why, then, if these are the child’s possibilities as well as the child’s parent’s possibilities, does the Society disregard aspects of the parent’s rehabilitation in its advocacy and argue for a jurisprudence myopic and disingenuous, at variance with settled jurisprudential tenents and the teaching of mankind? If the child is not property and is not a gift or trophy to be awarded in the name of love, if there is no presumption at disposition, then why does the fact that the child’s needs have been met by the foster parent, that the foster parent loves and wishes to adopt the child, and that the foster parent enjoys the advantage of actual caring for that child serve to render illusory and unnecessary consideration of the life circumstances of the child’s parent in his or her desire to regain custody of their child, in their heroic effort at self-improvement and rehabilitation, in their expression of love for their child?
The statutory direction at disposition is that an order of disposition be made “solely on the basis of the best interests of the child, and there shall be no presumption that such interests will be promoted by any particular disposition” (Family Ct Act § 631 [emphasis added]). To ignore issues of rehabilitation and fitness of the child’s parent, to argue for termination at the commencement of disposition, to focus on the past life circumstances of the parent and foster parent without recognition of the current life circumstances, to adopt a jurisprudential axiom that past unfitness of necessity predicts future unfitness — all serve to effect a subtle presumption that the child’s best interests will be promoted by termination of parental rights. The child and the child’s parent as well as the foster parent are entitled to a “level playing field.”
To engage in unrecognized bias and in defense of that bias ascribe it to others does not lessen or ameliorate that bias, but encourages its growth. The antidote for such bias, whether imbuing the Legal Aid Society or the trial or appellate court, lies in recognition that the child’s due process, the child’s parent’s due process, requires recognition that the burden of proof at disposition on permanent neglect fact-finding is clear *246 and convincing evidence and not mere preponderance. This also serves to lessen the tendency of the court as well as the Legal Aid Society to hubris.
Justice also stands witness to the road not taken.[2]
There should be honor in justice.
Petition dismissed.
[Portions of opinion omitted for purposes of publication.]

. Reflective of the sentiment expressed by the English metaphysical poet John Donne (1572-1631): “No man is an island * * * any man’s death diminishes me, because I am involved in Mankind; And therefore never send *243 to know for whom the bell tolls; it tolls for thee,” this court in a lecture to members of the Bar sponsored by the Queens County Bar Association Academy of Law on Juvenile Delinquency and Persons in Need of Supervision held on May 23, 2001, stated: “I propose that we all join in a crusade to bring honor to the Family Court and the ideals for which it was created. To honor the term family, the concept family, the life of family. To bring not just our professionalism, but our humanity to the task. To recognize in the needy child whether under Article 7, Article 3, Article 10, or TPR proceedings, our child, our self. To recognize in the needy parent our self. To comprehend that when a child is before us, a parent is also and that when a parent is before us, a child is also. Does not the term child imply parent and the term parent imply child. To the extent that we contribute by delay or inaction in the exercise of our power as judges and officers of the court to the failure of a parent or a child, we have not done good, we have not acted humanely, we have not honored Family Court or that family for which the court is named.”

. Robert Frost (1874-1963) American lyric poet:
“Two roads diverged in a wood, and I—
“I took the one less traveled by,
“And that has made all the difference.”